### ARGUED AND DETERMINED

#### IN THE

# SUPREME JUDICIAL COURT

#### OF

# MASSACHUSETTS.

---

COMMONWEALTH *vs.* JAMES H. COSTLEY.

Norfolk.    February 1. — 16, 1875.    COLT & DEVENS, JJ., absent.

JAMES H. COSTLEY *vs.* COMMONWEALTH.

Norfolk.    June 21, 1875.    COLT & AMES, JJ., absent.

An indictment for murder by shooting with a pistol need not allege that the pistol was held in the hand of the defendant.

On the trial of an indictment for murder on May 13, it appeared that the defendant on May 8 brought a heavy valise to a certain stable and left it there until the evening of May 13, when he hired a horse and buggy at the stable, saying that he was going to Weymouth Landing (about eleven miles distant) and drove away taking the valise with him, and returned about one o'clock in the morning of the next day. The body of the murdered person was afterwards found at the bottom of the channel near Weymouth Landing, with the head wrapped in a carriage robe tied tightly with a rope around the neck, and a tailor's goose weighing twenty-four pounds, and inclosed in a gunny bag, attached to her neck by another rope. The government contended that the valise contained the articles thus attached to the body, and a valise was exhibited to the jury which the stablemen testified resembled in appearance and weight the valise left at the stable. The constable who had sole charge of the valise during the trial was permitted to testify that the valise shown him was the one shown the other witnesses, that it contained the articles in question, and that when the other witnesses examined it in court they were ignorant of its contents. The defendant objected to this evidence on the ground that it showed that it was a trick to give credibility to the judgment of the other witnesses. *Held*, that the evidence was properly admitted.

Upon the issue whether a murder was committed in the county of N. as alleged in the indictment, there was evidence that the defendant, in the night time, left B., in the county of S., with a horse and buggy, saying he was going to W., in the county

of N. The body of the murdered person was afterwards found near W. The distance from B. to the place where the body was found was about eleven miles, and from B. to the line of the county of N. was about six miles. *Held*, that evidence that the country between B. and the county line of N. was very thickly settled, and beyond that line was partly very open and partly wooded was competent, and might be considered by the jury in connection with the other evidence in the case.

The judge presiding at a criminal trial read to the jury the instructions requested by the defendant, stating how far they were given, refused or modified, and requested his attention called at the close of the charge to any variation in the charge from what he then said. This was not done. *Held*, that, although the bill of exceptions referred to the charge as a part thereof, the statements of law therein contained upon the points embraced in the prayers for rulings were not subject to revision in this court.

A bill of exceptions should not set forth the whole charge to the jury, but only the points of law raised at the trial and the rulings thereon.

"Moral certainty" and "proof beyond a reasonable doubt" are synonymous terms, signifying such proof as precludes every reasonable hypothesis except that in support of which the evidence is offered; and no exception lies in a capital case to a refusal to use the term "moral certainty," if an equivalent expression is used.

Where several forms of expression are equally accurate, it is within the discretion of the judge presiding at the trial to choose, in charging the jury, that form which he deems best adapted to make the rule of law intelligible to them.

Under the Gen. Sts. *c. 171*, §§ 17, 18, a conviction may be had in one county, upon an indictment for murder, if the pistol causing the death was fired in an adjoining county more than one hundred rods from the dividing line between the two counties and the death ensued in the county alleged in the indictment, within one hundred rods of that line.

The finding of a human body, with marks upon it of injuries sufficient to cause death, in a river in the heart of a county, in such a situation and condition as to show that it must have been thrown there by the hand of man and not borne there by the force of the stream or current, is sufficient to warrant the jury in finding that the homicide was committed in that county.

On the trial of an indictment for murder, by shooting with a pistol, the defendant requested instructions to the jury that the government must prove that the proximate cause of the death was a wound from a pistol and not from any other cause; that, although the deceased may have received a mortal wound from a pistol, yet if before death, though the deceased remained insensible, any other cause of death intervened so as to hasten death in any degree, then the pistol wound was not the cause of the death, and if the jury were in doubt whether such additional cause of death did intervene, the prisoner could not be found guilty on the indictment. The court declined to give this instruction; and ruled that the government must prove that the pistol wound, if given by the prisoner, was the cause of the death; that if other circumstances came in to prevent any recovery that might otherwise have taken place or to aggravate the effect of the wound, yet if the wound was the cause of which the deceased died, such other circumstances did not prevent the wound from being the cause of the death; but if, while alive, another cause came in which, independently of the pistol wound, caused the death, then the defendant was not guilty on the indictment. *Held*, that the defendant had no ground of exception.

On the trial of an indictment for murder, there was evidence tending to show that the homicide was committed in the county alleged. The defendant requested the court to instruct the jury, that the fact, if they should find it, that there was no evidence tending to show that the homicide was committed in either of two counties adjoining, was not to be considered by the jury as evidence as to whether the homicide was committed in the county alleged. The court declined to give this instruction, and ruled that the point was to be considered by the jury upon all the circumstances of the case, and that if they thought that, if it had been committed elsewhere, the defendant would have the means of showing it by other witnesses, they might consider the absence of evidence that it was committed in another county. *Held,* that the defendant had no ground of exception.

On the trial of the indictment of a man for the murder of a woman, the judge submitted to the consideration of the jury all the evidence of the relations and intercourse between the prisoner and the deceased for six months before the homicide; refused to rule, as requested by the defendant, that there was no evidence of any engagement of marriage between them; and ruled that the jury should consider all the facts as showing the relations and explaining the conduct of the parties. *Held,* that the defendant had no ground of exception.

On the trial of an indictment for murder, the defendant requested the judge to instruct the jury that he was not bound to show by evidence where he was from six o'clock in the afternoon of the alleged day of the murder, to two o'clock the next morning, and that the jury should draw no inference from any failure so to do. The judge declined to give this instruction, but ruled that the question was entirely for the jury; that if a prisoner was shown to be in any connection with the transaction which seemed to them to put into his possession facts which, if innocent, he would use, which he could use without going upon the stand himself, the withholding of those means to explain the circumstances might be considered by the jury, in connection with the other testimony, in determining how far he was responsible for the occurrence. *Held,* that the defendant had no ground of exception.

Upon a trial for murder by shooting with a pistol, the defendant requested the court to instruct the jury that they must consider separately every material allegation in the indictment, including time, place and means, and that the fact that they might find any one allegation proved must not be taken to aid in, or be connected with, the determination of any other allegation. The court instructed the jury that every material fact essential to establish the offence must be found separately, in the sense that it must be found and established in their minds; but that it was not necessary for them to separate the facts in finding, nor to detach one fact from another; that if they found clearly that the defendant shot the pistol, that fact might be used in connection with the other evidence in finding the other facts involved in the indictment, such as malice; that it of course must aid, will aid in connection with the evidence of his whereabouts; and might aid in fixing the time, the place, the means. *Held,* that the defendant had no ground of exception.

In this Commonwealth it is not the right of a party, even in a capital case, to have the jury polled.

Under the St. of 1869, *c.* 433, § 2, a person indicted for murder may be arraigned before one judge of this court in vacation, at a time appointed pursuant to that statute.

The record of the trial of a person indicted for murder set forth the certificate of a judge of this court, made in vacation, reciting that the indictment had been transmitted by the Superior Court to this court and entered therein and notice thereof

sent to the chief justice and to the attorney general, with a copy of said indict-
ment, and appointing a day and hour at the court house in D., in said county, for
the arraignment of the accused; and that in obedience to said order on the day
named, at the court house in D., in said county, the prisoner was brought in by
the sheriff of said county before one of the justices of this court. *Held*, that the
record was regular, and showed a compliance with the order, although it did not
state that the arraignment was at the hour appointed.

Under the Constitution and statutes of this Commonwealth, a sentence of death may
leave the time of execution to be fixed by the Governor and Council.

JAMES H. COSTLEY was indicted for murder, in one count,
as follows: "The jurors for the Commonwealth of Massachusetts
on their oath present, that James H. Costley, late of Hanover in
the county of Plymouth, on the thirteenth day of May in the
year of our Lord one thousand eight hundred and seventy-four,
at Braintree in the county of Norfolk aforesaid, with force and
arms in and upon one Julia Hawks, feloniously, wilfully, and of
his malice aforethought, did make an assault; and that the said
James H. Costley a certain pistol, then and there charged with
gunpowder and one leaden bullet, then and there feloniously,
wilfully, and of his malice aforethought, did discharge and shoot
off to, against and upon the said Julia Hawks; and that the said
James H. Costley, with the leaden bullet aforesaid, out of the
pistol aforesaid, then and there by the force of the gunpowder
aforesaid, by the said James H. Costley discharged and shot off
as aforesaid, then and there feloniously, wilfully, and of his
malice aforethought, did strike, penetrate and wound the said
Julia Hawks in and upon the left side of the head of the said
Julia Hawks; giving to the said Julia Hawks then and there,
with the leaden bullet aforesaid, so as aforesaid discharged and
shot off out of the pistol aforesaid, by the said James H. Costley,
in and upon the left side of the head of the said Julia Hawks,
one mortal wound of the depth of six inches and of the breadth
of half an inch; of which said mortal wound the said Julia
Hawks then and there instantly died. And so the jurors afore-
said, on their oath aforesaid, do say that the said James H.
Costley, her, the said Julia Hawks, in the manner and by the
means aforesaid, feloniously, wilfully, and of his malice afore-
thought, did kill and murder; against the peace of said Com-
monwealth, and contrary to the form of the statute in such case
made and provided."

Trial before *Wells* and *Devens*, JJ., who allowed a bill of exceptions in substance as follows:

Before the jury were empanelled, the defendant moved to quash the indictment, "because there is no allegation that the pistol named therein as the weapon with which the homicide was committed was had or held by the defendant at the time of the commission of the offence in his, the defendant's, hand or hands." This motion was overruled, and the defendant excepted.

At the trial, there was evidence tending to show that the dead body of Julia Hawks was found on May 24, 1874, at the bottom of Fore River, so called, near the bridge crossing the same, in East Braintree, about one hundred rods from Weymouth Landing. The body was in the channel of the river, about four feet down stream from the draw of the bridge, and about six feet from the abutment of the draw towards the centre of the stream. The head was wrapped in a carriage robe, folded double, and tied tightly with a rope about her neck, and a tailor's goose, weighing twenty-four pounds, and inclosed in a gunny bag, was attached with another rope to her neck. The carriage robe was not perforated.

There was also evidence tending to show that on or about May 8, 1874, the defendant brought from Hanover to Boston a valise, which the government contended contained this carriage robe, goose, rope and gunny bag, and that on May 9 the defendant left the valise and contents at Riedell's stable, in Van Rensselaer Place, in Boston; that it remained there until May 13, and that while it was there it was observed and lifted by various persons in the stable. There was no other evidence of the contents of the valise than the weight of it, which was claimed to be unusual.

On the examination of Riedell and others connected with his stable, a valise was exhibited to the jury, and the witnesses asked as to the identity and weight of the valise in court as compared with the one left at the stable, and they testified that they resembled each other in appearance and weight.

On the fourth day of the trial, a constable of the Commonwealth was called by the government, and was permitted to testify, against the objection of the defendant, that he had been present during all the trial, and had had sole charge of a valise

which he exhibited, and that it was one and the only one which had been used in evidence. He was then asked what were the contents of the valise, if he knew, when the previous witnesses testified.

The defendant's counsel, disclaiming any imputation of wrong intention on the part of the constable or the attorneys for the Commonwealth, objected that this was a device in the nature of a trick, unprecedented and irregular; that the contents of the valise were not known to either of those witnesses; that it was a device to give credibility to their judgment, and their judgment might have been much affected by a knowledge of what was in the valise; that there was much better evidence of what the contents were at the time by exhibiting them when each of the witnesses was on the stand; that the government was now resorting to a narrative of something that was not done in the presence of those witnesses, not with their knowledge, nor with the knowledge or consent of the defendant's counsel, who, if they had known what was going on, might have looked at the condition of things, and have cross-examined each witness in relation to the matter.

The court said that the proceeding did not appear to be of a character to be designated as a trick; and that it would have been competent, of course, to have opened the valise at the time, and shown what was in it; but it was not incompetent to show what was in it by this witness, who had the valise, and put the various contents in it, and knew what was there; and ruled that it was competent for this evidence to be put in at this point. The defendant excepted to this ruling.

The constable then, at the request of the district attorney, testified what articles were in the valise at the time, and proceeded to put them in; and was permitted, in order to repel everything which tended to show that there had been a trick, and, against the objection of the defendant's counsel, to testify that he did not communicate the contents of the valise to either of the other witnesses before he went upon the stand, and that within his knowledge neither of them was aware of the contents of the valise; that the contents were put into the valise, before they testified, by himself and by his own direction; and that it did not at the time contain any other articles except those which he had pointed out.

The same witness was also, under the objection of the defend-ant allowed to testify that on one occasion, and one only, he had travelled by carriage road from the stable in Van Rensselaer Place, Boston, by the way of Neponset Bridge, to Quincy, and from Quincy to Weymouth Landing, by the road passing over the bridge where the body was found; that the road from the stable to Neponset was very thickly settled; that from Neponset to the bridge a portion of the country was very open, and the houses in some places half or three quarters of a mile apart; that between Quincy and the bridge there were a good many woods on the road; and that he had been over and examined the whole country within a radius of four or five miles of the bridge. The defendant excepted.

Several other witnesses, against the objection of the defendant, were permitted to state and describe the different roads from the stable to the different points on the Neponset River, and from the river to the bridge in question, and that in some places the country was thickly settled, and in others sparsely settled and with woods; and to this the defendant excepted.

There was evidence on the part of the government tending to show, that at about half past six on the evening of May 13, the defendant hired a horse and buggy at Riedell's stable above re-ferred to, saying that he was going to Weymouth Landing; that he drove away from there between that time and seven o'clock, alone, taking with him a valise as above stated, and two other parcels; that he returned at about one o'clock in the morning of May 14, alone; that it was about five miles from the stable, by the nearest route, to the line of Norfolk County at the Neponset River, and about six miles further to Weymouth Landing; that the deceased was last seen alive in Boston, on Washington Street, near Chester Square, not in company with the defendant, at about five o'clock in the afternoon of May 13, and then said that she was going to Weymouth Landing, to be gone two months; and there was no evidence tending to show by which of the several routes from the stable to the Neponset River, or from Neponset River to Weymouth Landing, the defendant went, if he went at all, to Weymouth Landing.

It also appeared in evidence, that from the place where the body was found to the line of Plymouth County the distance

varied, according to the road taken, from two and a half to three and a half miles, and that by the road leading from there to Hanover, in Plymouth County, where both the defendant and the deceased had lived up to about May 1, and the defendant also, except when temporarily absent, up to May 26, the time of his arrest, the distance to the Plymouth County line was about three miles.

It was the theory of the government that the deceased and the defendant met in Boston on the evening of May 13, and drove together to Weymouth Landing, and that the homicide was committed after leaving Suffolk County.

The government also introduced evidence tending to show, that upon the right foot of the deceased, when found in the river on May 24, there was a shoe shaped somewhat to the form of that foot, and no shoe upon the left foot; that on the morning of May 14, there was found at Riedell's stable, in the buggy used by the defendant on the night of May 13, another shoe somewhat shaped to the form of the left foot, and that the shoes were of similar pattern, size and manufacture, and were mates.

The government also put in evidence that on or about May 1, 1874, the deceased went to a room at the house of one Day in Camden Street, in Boston, and received a key to the room from Mrs. Day, and that the deceased remained in possession of the room up to May 13; that on the morning of May 14, about ten o'clock, the defendant called at Mrs. Day's and presented this key, saying, that Mrs. Hawks wanted him to get the things she had left there, and that he then took them away.

The foregoing was all the evidence in the case on the question as to where the homicide was committed; and at the close of the government's case, and also after the evidence for the defence was in, the defendant moved the court to direct a verdict of not guilty, for the following causes: " 1. Because the Commonwealth has introduced in support of the indictment no evidence tending to show that the homicide was committed within the body of the county of Norfolk, or within one hundred rods of the boundary line thereof. 2. Because the Commonwealth has introduced in support of the indictment no sufficient evidence that the homicide was committed in the county of Norfolk, or within one hundred rods of the boundary line thereof. 3. Because the

Commonwealth has introduced in support of the indictment no evidence from which it will be competent for the jury to find beyond reasonable doubt that the homicide was committed in the county of Norfolk, or within one hundred rods of the boundary line thereof." The court declined so to rule, and the defendant excepted.

The government further offered evidence, through Dr. Forsaith, and Dr. Tinkham, physicians, by whom an autopsy of the body of the deceased was made a few hours after it was taken from the river, to the effect that the ball from the pistol entered the left side of the head, at a point about an inch or an inch and a half above the external angle of the orbit of the left eye, and about an inch or an inch and a half backward therefrom, and passed through the brain in a straight line, in a direction a little upward and backward, striking the right side of the skull on the inner side, at a point in the lower third of the parietal bone, near its junction with the frontal and temporal bones of the skull, and that at this last point was found a stellated fracture of the skull, with the points of the fracture everted or pushed out; that the ball was not imbedded in the right side of the skull, but, upon dissection of the brain, fell, from between the outside of the brain and the inside of the skull, upon the floor; that upon the right side of the head, and of a circular form, having its centre, as near as could be determined, coincident with the centre of the said stellated fracture, was an extended tumefaction or swelling of about an inch and half radius, the surface of which was elevated above the surrounding covering of the head from one fourth to one half an inch, accompanied with well marked ecchymosis; that there was a slight abrasion of the skin on the right frontal portion of the face, and there were indications of effusion of blood upon the brain; that other than these there were no external marks of violence or disease upon the body, and that no examination was made by them of any other part of the body except the uterus, as to which the physicians testified that she was not, at the time of her death, pregnant. Upon this examination, these physicians expressed the opinion that death, resulting from the bullet wound in the head, though not necessarily, was probably instantly fatal, and that she died from the effects of this wound.

Evidence was offered by the defendant from Dr. Fifield, Dr. Cheever and Dr. Gay, tending to show that the wound as described by the witnesses, Dr. Forsaith and Dr. Tinkham, was not necessarily instantly or at all fatal; that the ball in its course did not involve any important veins, arteries or sinuses, the destruction of which would lead to such effusion of blood upon the brain as to indicate speedy death therefrom; that it was probable that the deceased may have lived an indefinite period of time, it might be three or ten hours, or longer, after the infliction of the pistol wound; and that she would have been rendered unconscious by the wound.

Evidence was offered by the government tending to show that Julia Hawks had been in the employment of the defendant for about nine months, in a hotel in Hanover kept by the defendant; that prior to January, 1874, she had been a cook, and from January, 1874, up to May 1, 1874, she had been employed by the defendant as housekeeper; that on or about April 27, 1874, the defendant engaged a room for her at a house in Camden Street, in Boston, and paid one week's rent therefor in advance; and that the defendant called upon her at said room three times between May 1 and 13. The government also offered evidence tending to show that the defendant spent the night of May 9 at the Creighton House in Boston, with a woman, having entered his name upon the hotel register as J. Costello and wife, and occupying the same room with her. There was no direct evidence tending to show that this woman was Julia Hawks, and the only circumstantial evidence tending to show this was evidence of prior and subsequent connection between the defendant and Julia Hawks, claimed by the government as tending to show that the defendant was guilty of the alleged homicide; and other than this there was no evidence tending to show what were the relations existing between them. It was contended by the attorney general that an engagement of marriage had existed between the defendant and Julia Hawks, or there had been some promise or inducement held out by him, or expectation encouraged; and that this, in connection with the fact that it was shown and admitted that he was, on and prior to May 13, under an engagement of marriage with Miss Cushing, who was possessed of property amounting to at least the sum of $12,000, showed a motive for the defendant to commit the alleged homicide.

The defendant requested twelve rulings, all of which are contained in the rulings of the presiding judge, which were as follows:

" Some portions of the instructions prayed for by the counsel for the defendant will be directly and distinctly covered by the statements which I shall make to the jury, but others of them will be modified considerably; it may, perhaps, simplify the proceedings, if I read these over, and state how far they are given, or refused, or modified, so that I need not take them out of the order that I had intended in the course of the charge; and if I vary from what I suggest now in any particular, either by a different modification, or by an omission of, or any addition to, what I now state, I desire, when I close the charge, to have my attention called to anything of that character.

" The first is, ' That the government must prove that the homicide was committed within the county of Norfolk, or within one hundred rods of the boundary line thereof, with the same moral certainty as they must prove the fact of the homicide itself.'

" The instruction will be, that they must prove that fact, and that, being a fact to be proved in the case, it will be governed by the same principles which are announced as to the reasonable degree of certainty with which proof must be made. I do not use the words, ' the same moral certainty,' which are in the prayer; with that exception, that ruling is adopted.

" The second is, ' That the jury cannot find that the homicide was committed in the county, from the fact that the character of the country in Norfolk County may be more wooded and sparsely settled than in Suffolk County, or in any way better adapted to the commission of the crime.'

" The instruction as prayed for will not be given; but the court will instruct the jury that the circumstances there mentioned are circumstances which they may take into consideration in connection with the other circumstances and all the evidence in the case bearing upon the question.

" Third. ' That there is in this case no presumption that Julia Hawks was killed at the place where her body was found, nor within the town or county where it was found, nor in any particular place, town, or county, and that the jury are not at liberty to find or infer that she was killed in any particular place, town,

or county, in the absence of evidence pointing to such place, town, or county.'

"The court will rule that there is no presumption, as asked for; but will also rule that the finding of the body, with the marks of injuries sufficient to cause death, in the body of the county, in the absence of all evidence whatever to show that the offence was committed anywhere else, would warrant the jury in finding the offence committed in the county where the body is found.

"Fourth. 'That there is no more a presumption from the finding of the body in the river in Braintree that the homicide was committed in the county of Norfolk than in the county of Suffolk, or the county of Plymouth.'

"Having said in the previous statement that there is no presumption either way, it is a question of fact, under all the circumstances of the case, in which county it was done.

"Fifth. 'That any presumption as to the place of the homicide, which might arise from the finding of the body in a given place, is in this case destroyed by the evident physical impossibility that the offence should have been committed in the place where the body was found.'

"That ruling becomes entirely unnecessary; it is superseded by what I have already said, and all the questions that would arise upon that ground are covered, I think, by the ruling.

"Sixth. 'That the government must prove with the same moral certainty that the proximate immediate cause of the death of the deceased was a wound from a pistol, not suffocation, strangulation, drowning, or any other cause.'

"Seventh. 'That although the deceased may have received a mortal wound from a pistol, yet, if before death had actually resulted therefrom, though the deceased remained entirely insensible, any other cause of death intervened so as to hasten her death in any degree, then, in contemplation of law, the pistol wound was not the cause of death; and if the jury are left in doubt whether such additional cause of death did intervene, the prisoner cannot be found guilty on this indictment.'

"Upon the subject of these two prayers the ruling will be, substantially, that the government must prove, in the way all necessary facts are proved in criminal trials, that the pistol wound given by the prisoner, if given by him, was the cause of

the death of Julia Hawks. If other circumstances came in to prevent any recovery that might otherwise have taken place, or to aggravate, even, the effect of the wound, yet, if the wound was the cause of which she died, the fact that such other circumstances hastened or retarded the effect of the wound, does not prevent the wound from being the cause of the death; but if, while alive, another cause came in, which, independently of the pistol wound, caused the death, so that the death resulted from that, and not from the pistol wound, then the jury cannot here find a verdict of homicide from the cause alleged in this indictment.

" Eighth. ' That the fact, if the jury shall find it, that there is no evidence in the case tending to show that the homicide was committed in the county of Suffolk, or the county of Plymouth, is not to be considered by the jury as evidence as to whether the alleged homicide was committed in the county of Norfolk.'

" The instruction prayed for is not given as prayed for; neither does the court deem it necessary to rule that that fact is evidence; but all the circumstances of the case connected with the whereabouts of the parties before, and of the prisoner after, and all the circumstances connected with their conduct, together with the situation in which she was found, may be taken for the purpose of determining this question; and if the jury think that from the course which the parties took if it had occurred in such county, evidence of it might have been found, or if it had occurred in such other county, the prisoner's counsel would have had the means of showing it, they may consider the absence of evidence that it occurred in any other county.

" Ninth. ' That there is no evidence in this case that there was any engagement of marriage at any time between the prisoner and Julia Hawks.'

" The court do not deem it necessary to rule, whether there is or is not evidence of an engagement of marriage. The jury may take all the facts which are narrated, showing the relations that existed between the prisoner and Julia Hawks, their intercourse during the six months previous to the homicide, and when they have considered them carefully, they will give to it just such effect as they deem it is entitled to have, in explaining the conduct of the parties. We do not deem it necessary for the

court to rule, whether there is or is not evidence of an actual engagement of marriage.

"Tenth. 'That the defendant is not in law bound to show by evidence where he was from about six o'clock, P. M., of May 13, to two o'clock, A. M., of May 14, and the jury should draw no inference from any failure so to do.'

"As a general proposition in regard to a defendant charged with an offence, that may be correct. Whether this defendant is, by the evidence which has been adduced against him, shown to have been in such relations to Julia Hawks, and to the occurrences of that day, that if he were innocent, he would be able, through his counsel, and through evidence, other than himself, to give any explanation of his apparent connection with the affair; if he is in such a situation, there may properly be inferences drawn from his failure to do so; but whether or not his failure to give any explanation is evidence against him, which the jury may consider, is entirely for them to determine, not for the court. to say. Whenever a prisoner is shown to be in any connection with a transaction which is under investigation, which seems to the jury to put into his possession or knowledge facts which, if innocent, he would use, which he has in his possession and could use without going upon the stand himself, the withholding of those means to explain the circumstances may be considered by the jury in connection with the other testimony in determining how far he is chargeable with responsibility for the occurrence; but it is entirely a question for the jury, upon the whole evidence which is before them, to judge of it as they measure the conduct of men, by means of their experience and knowledge of men.

"Eleventh. 'That the jury must consider separately every material allegation in the indictment, including malice, place, and means, and if any one fails to be proved beyond a reasonable doubt, the prisoner must be acquitted; and that the fact that they may find any one allegation proved must not be taken to aid in, or be connected with, the determination of any other allegation.'

"The jury must find every material fact essential to establish the offence of which he is to be convicted; they must find them separately, in the sense that each one must be found and estab-

lished in their minds. It is not necessary for them to separate them in finding, nor to detach one fact from another. If they find clearly that the prisoner shot this pistol, then that fact is not to be laid aside, but may be used in connection with the other evidence in finding the other facts which are involved in the indictment, such as malice. It of course must aid, will aid, in connection with the account that the evidence will give of his whereabouts. It may aid in fixing the time, the place, the means.

" Twelfth. ' That there is not sufficient evidence of the commission of the homicide in the county of Norfolk, and that on that ground the defendant must be acquitted.'

" That, the court think, is for the jury entirely, and that there is evidence upon which the jury may, if it satisfies them, find a verdict.

" If I have made any manifest error, or omitted any essential part of the instructions, I hope either party will call my attention to it."

To the refusals of the court to rule as requested, and to the modifications of the requests, the defendant excepted. The defendant further asked leave to refer, for the purpose of explaining or illustrating these rulings, to the charge of the court.

The jury returned a general verdict of guilty in the first degree, through the response of their foreman to the clerk of the court; and thereupon, and before the verdict had been affirmed or recorded by the court, the defendant's counsel requested that the jury might be polled, and each juror separately inquired of as to his verdict.

This request was refused, and the verdict was affirmed in the usual mode, to which refusal the defendant excepted.

The exceptions were allowed, " with leave to refer to the charge as requested." So much of the charge, as was referred to by the defendant's counsel at the argument, was as follows :

" The government must prove, so as to satisfy the minds of the jury beyond a reasonable doubt, all the facts essential to constitute the offence charged. They must, in order to convict of any offence, prove that it was committed in the county of Norfolk, ' or within one hundred rods of the line,' which clause is inserted for the purpose of covering doubtful cases. They

must prove that it was committed by the prisoner, and, in order to convict of murder, it must be proved that the wound inflicted upon the head of Julia Hawks by the prisoner was the cause from which her death resulted.

"It is recognized as a necessity that the government in criminal cases shall establish every fact essential to the crime, without which the crime is not made out beyond a reasonable doubt A reasonable doubt is not such a doubt as any man may start by questioning for the sake of a doubt, nor a doubt suggested or surmised without foundation in the facts or testimony. It is such a doubt only as in a fair, reasonable effort to reach a conclusion upon the evidence, using the mind in the same manner as in other matters of importance, prevents the jury from coming to a conclusion in which their minds rest satisfied. If so using the mind, and considering all the evidence produced, it leads to a conclusion which satisfies the judgment, and leaves upon the mind a settled conviction of the truth of the fact, it is the duty of the jury so to declare the fact by their verdict. It is possible always to question any conclusion derived from testimony. Such questioning is not what is a reasonable doubt, but the circumstances, if the case is one of circumstantial evidence, must so concur that no well established fact or circumstance, which is capable of controlling the case, should go counter to the conclusions sought to be reached, or which are to be reached. If all the circumstances concur in one result, it is for the jury to say whether those circumstances are sufficient to establish that result, or whether there is a failure to cover probabilities of the case, so as to make it reasonably certain that the fact has been made out before you.

"As I said in the outset, it is necessary for the government to prove, as it is necessary for them to prove all the other facts in the case to your satisfaction, beyond any reasonable doubt, that the offence was committed in the county of Norfolk. It is not necessary to prove that the pistol was fired within the county of Norfolk. If the pistol was fired in Suffolk County, but she died in Norfolk County, or within one hundred rods of the line, the offence may be prosecuted in the county of Norfolk. The statute is, ' If a mortal wound is given, or other violence or injury inflicted, or poison is administered, in one county, by means

whereof death ensues in another county, the offence may be prosecuted and punished in either county.' This may or may not have a bearing upon the case, according as you may give effect to the evidence which tends to show where it may have been committed, and to the evidence as to the continuance, for some indefinite period, of life in the body of Julia Hawks. As already suggested, the body being found, with the bullet wound in the head, dead, within the body of the county of Norfolk, although that does not prove that she was shot in the river where she was found, still it may be taken with all the other circumstances in the case, and if the other circumstances are consistent with it, they may authorize you to find that she was shot, and came to her death from that wound, in the county of Norfolk. But in this case, it is argued that there are some other circumstances which affect the probabilities. You are to consider those in connection with the place where she is found. You are to consider, of course, the distance to this place from the county line, either in one direction or the other, as you may be satisfied from the evidence as to the direction from which the party came to the point where she was found. You will consider the probabilities from the difficulty of transporting after death. You will also consider the place where she was last seen, which was in the county of Suffolk, and her declarations there, also, as to where she was going ; and you will consider the whereabouts of the prisoner, because this investigation as to where it occurred may be affected by the question whether this prisoner committed the offence, and therefore you may consider his whereabouts, and his declarations as to where he was going, and the time of his return. If this meeting was not planned, or if the declared purpose of each was carried out, and each went there independently of the other, and came together accidentally, then that might give rise to one inference. If they met in Boston, and she came out with him, that might perhaps give rise to a different inference as to the time and place of committing the offence. And in this connection you may consider the nature of the regions passed through between the place where the two were seen in Boston, and where the body was found ; the nature of those regions, and the opportunities of committing the offence ; and in that connection you will take into view the description of

the different localities, and the probabilities as to what sort of locality he would be likely to seek in which to commit it; and you may take into consideration also the existence of the Neponset River, which I believe is the boundary line, and the opportunities which that might afford in case it were committed on one side or the other of that river. The question involves inference as to the probabilities from all you have learned in regard to the place with which the two parties were familiar; in regard to their whereabouts, as shown by the evidence; in regard to their declarations as to where they were going when they started from Boston; and all the probabilities arising out of the effect upon the action of the parties which the character of the opportunity, if there was an opportunity, might produce. The jury will draw from all this evidence such an inference as in their judgment and experience satisfies them as to the locality of the homicide, if there was a homicide committed by the prisoner."

*B. Sanford & H. R. Cheney,* for the defendant. 1. The indictment was defective in containing no allegation that the pistol was held in the hand of the defendant. 1 East P. C. 341. 2 Hale P. C. 185, citing *Cuppledick's Case,* B. R. 44 Eliz. 2 Bish. Crim. Proc. § 515.

2. It was not competent for the state constable to testify that the valise shown him was the one which had been put in evidence on the same trial. That was for the jury. It would not have been competent for the government, in the presence of the jury and of the witnesses, to put the articles named into the valise, and then to ask the witnesses how its then weight compared with the weight of the valise left in the stable. And it was not competent for the government to show that this had been done without the knowledge of these witnesses. If it was competent to show the contents of the valise at the time of the testimony of Riedell and others, it could be done only by the best evidence, the exhibition of its contents to the jury at the time.

3. The character of the country in Norfolk in no way tended to show the commission of the crime there. The court, in the absence of evidence pointing to the place of the homicide or showing any route taken by defendant, should have excluded this evidence or directed the jury to disregard it.

4. The ruling on the first prayer should have been as requested. Proof to a " reasonable degree . of certainty " is not sufficient. Proof was required to a moral certainty excluding every other reasonable hypothesis. *Commonwealth* v. *Webster*, 5 Cush. 295, 313, 319, 320.

5. Death in Suffolk within one hundred rods of Norfolk from violence done in Suffolk more than one hundred rods from Norfolk, will not authorize a prosecution in Norfolk. Gen. Sts. *c.* 171, §§ 17, 18.

6. The rulings on the third, fourth, fifth and twelfth prayers, and the defendant's motion for a verdict of not guilty, were erroneous. It was impossible for the offence to have been committed where the body was found. Therefore the government should have been required to show that it was committed somewhere else within the county. This impossibility, proven along with the *corpus delicti*, takes away any ground which might otherwise exist for a presumption or finding as to the place of the homicide. The case is analogous to the doctrine of malice as presumed from the bare fact of a homicide. When the same evidence which proves the homicide disproves the malice, the proof of malice must be sought elsewhere. *Commonwealth* v. *York*, 9 Met. 93. *Commonwealth* v. *Webster*, 5 Cush. 304. *Commonwealth* v. *Hawkins*, 3 Gray, 463. The rule as to place in forgery will apply here. It is not sufficient that the body be found dead in the county. *Commonwealth* v. *Parmenter*, 5 Pick. 279. *Rex* v. *Crocker*, 2 N. R. 87. *Rex* v. *Parkes*, 2 Leach, (4th ed.) 787. The evidence was insufficient in law to support a verdict that the pistol was fired, or that the deceased died therefrom, in Norfolk County. There was in fact no evidence that either happened in Norfolk County. The evidence was equally consistent with the doing of either or both of these acts in Suffolk or Plymouth County. In such case the court should direct a verdict for the prisoner. *Commonwealth* v. *Packard*, 5 Gray, 101. *Chase* v. *Breed*, 5 Gray, 440. *Commonwealth* v. *Merrill*, 14 Gray, 415, 417. *Denny* v. *Williams*, 5 Allen, 1. *Commonwealth* v. *Intoxicating Liquors*, 105 Mass. 595.

7. As to the sixth and seventh prayers, the ruling should have been in substance that, if the jury were satisfied that by reason of any strangulation, suffocation, drowning, or other cause of death intervening after the shooting, the death of Julia Hawks

was hastened, so that it took place sooner by reason of such intervening cause than it would have occurred in consequence of the shooting alone, then such suffocation, strangulation, drowning, or other cause would be the immediate and efficient cause of death. *Commonwealth* v. *Fox*, 7 Gray, 585. *Rex* v. *Murton*, 3 F. & F. 492. *State* v. *Morea*, 2 Ala. 275. *State* v. *Scates*, 5 Jones N. C. 420. And if it is left in doubt on the evidence whether the death, when it happened, was caused by the shooting or such subsequent intervening cause, the defendant is entitled to an acquittal on this indictment. *Commonwealth* v. *Fox*, 7 Gray, 585. *Rex* v. *Webb*, 1 Mood. & Rob. 405.

8. The eighth instruction asked for should have been given Neither the prisoner or his counsel should be called upon to show that the homicide was committed in some other county. The burden was on the government throughout. 1 Whart. Crim. Law, (7th ed.) § 707 *a*. *Commonwealth* v. *McKie*, 1 Gray, 61. *Commonwealth* v. *Hardiman*, 9 Gray, 136. *Commonwealth* v. *Kimball*, 24 Pick. 366. 1 Archb. Crim. Pl. (7th ed.) 231.

9. As affecting the question of motive, the ruling on the ninth prayer should have been as asked for. The evidence was insufficient to support a finding by a jury of an engagement of marriage between the prisoner and the deceased.

10. The instructions upon the tenth prayer should have been more cautionary, as in *Commonwealth* v. *Webster*, 5 Cush. 316.

11. The eleventh ruling was erroneous in stating that the fact, if found, of the shooting of the pistol by the prisoner, might, must and will aid in determining the place where it was shot. The burden was on the government to prove the place distinctly and independently, and in the same manner as if the whole issue rested on it. *Commonwealth* v. *Webster*, 5 Cush. 313, 318. *State* v. *McCluer*, 5 Nev. 132. 1 Whart. Crim. Law, (7th ed.) § 707 *a*. The instruction that this fact, if found, " of course must aid, will aid " in determining other essential facts, is a charge with respect to a matter of fact. *Commonwealth* v. *Foran*, 110 Mass. 179. *Commonwealth* v. *Barry*, 9 Allen, 276.

12. The prisoner should be allowed to poll the jury. It is a common law right, and is now recognized in many of the states. 2 Hale P. C. 299. *Watts* v. *Brains*, Cro. Eliz. 778. 6 Dane Ab. 230. *People* v. *Perkins*, 1 Wend. 91. *Labar* v. *Koplin*,

4 Comst. 547. *Hubble* v. *Patterson*, 1 Misso. 392. *High* v. *Johnson*, 28 Wis. 72.

*C. R. Train*, Attorney General, for the Commonwealth.

GRAY, C. J. The defendant has been indicted and convicted in the county of Norfolk of the murder of Julia Hawks, by shooting her with a pistol. The exceptions taken at the trial may conveniently be considered in the order in which they were presented at the argument.

1. The only objection to the form of the indictment is for the omission to allege that the pistol was held in the hand of the defendant. This objection is supported by a statement in 2 Hale P. C. 185, and by a case, there cited, decided in the time of Queen Elizabeth. But the materiality of such an allegation has been denied or doubted by the later English writers on criminal law. 2 Hawk. *c.* 23, §§ 76–84. 1 East P. C. 341. 1 Stark. Crim. Pl. (2d ed.) 92. 1 Russell on Crimes, (3d ed.) 558. Archb. Crim. Pl. (10th ed.) 407. It is not necessary to a full description of the crime, nor in order to inform the defendant of the particulars of the charge which he is to meet, and, if inserted, need not be proved. We are of opinion that it is of the same character as a description of the size of the wound, the omission of which does not affect the validity of the indictment. *Commonwealth* v. *Woodward*, 102 Mass. 155.

2. The indictment alleges, and the Commonwealth at the trial contended, that the murder was committed on May 13, 1874.

Evidence was introduced, which tended to show that the defendant on the 8th of May brought to Riedell's stable in Boston a valise of unusual weight, and left it there until six or seven o'clock in the evening of the 13th, when he hired a horse and buggy at that stable, saying that he was going to Weymouth Landing, and drove away, taking the valise with him, and returned about one o'clock in the morning ; and that the body of Hawks was found on the 24th of May at the bottom of the channel of the river near Weymouth Landing, with the head wrapped in a carriage robe tied tightly with a rope about the neck, and a tailor's goose, weighing twenty-four pounds, and inclosed in a gunny bag, attached to her neck by another rope. It was contended for the Commonwealth that the valise left by the defendant at the stable contained the articles thus attached to the ˋ ːdy ;

and a valise was exhibited to the jury, which Riedell and others connected with his stable testified resembled in appearance and weight the valise so left there.

The constable who had sole charge, during the trial, of the valise exhibited to the jury, being called as a witness, was permitted to state that, at the time when the other witnesses testified about it, it contained the articles in question. This testimony was competent for the purpose of proving that this valise with these articles in it would correspond in weight with the valise left by the defendant at the stable. And his further testimony to the identity of the valise exhibited at the trial, and that he had not informed the other witnesses of its contents, and, so far as he knew, they were not aware of its contents when they gave their testimony, was competent for the purpose of repelling the imputation made by the counsel for the defendant that the proceeding was a device in the nature of a trick on the part of the officers of the Commonwealth.

3. The place where the body was found was eleven miles from Riedell's stable, six miles from the line between the counties of Norfolk and Suffolk in that direction, and three miles from the line between Norfolk and Plymouth in the other.

Evidence that the country along the road from the stable to the first county line was very thickly settled, and beyond that line was partly very open and partly wooded, was rightly admitted as tending to prove the comparative opportunities for committing the murder without probability of detection, in Norfolk and in Suffolk, and was submitted to the jury with appropriate instructions.

4. In the matter of the instructions to the jury, the only exceptions taken at the trial were to the refusals and modifications of the instructions requested. The subsequent charge of the court is referred to in the bill of exceptions, only for the purpose of explaining and illustrating those rulings. The presiding judge particularly requested that any variation from them might be called to his attention at the close of the charge, when any inadvertent expression might have been corrected in the hearing of the jury. This was not done. The statements of law contained in the charge are therefore not open to revision here. *Improvement Co.* v. *Munson*, 14 Wall. 442.

In order to prevent this manner of referring to the whole charge from being drawn into a precedent, it is proper to add that the presiding judge, as he informs us, was induced to depart from the regular and usual course in this respect, solely from the desire to afford to a defendant capitally convicted the fullest opportunity to present to the court of last resort the questions of law raised at the trial; and that the present case affords an example of the inconvenience and the danger of injustice which may result from embodying or referring to the entire charge in the bill of exceptions, which cannot be better stated than in the words of Mr. Justice Story in *Carver* v. *Jackson,* 4 Pet. 1, 81, approved and adopted by Chief Justice Marshall in *Ex parte Crane,* 5 Pet. 190, 198 : " If, indeed, in the summing up, the court should mistake the law, that would justly furnish a ground for an exception. But the exception should be strictly confined to that misstatement; and, by being made known at the moment, would often enable the court to correct an erroneous expression, or to explain or qualify it in such a manner as to make it wholly unexceptionable, or perfectly distinct. We trust, therefore, that this court will hereafter be spared the necessity of examining the general bearing of such charges." See also *Burt* v. *Merchants'. Ins. Co.* 115 Mass. 1, 16.

The first instruction requested by the defendant was that " the government must prove that the homicide was committed within the county of Norfolk, or within one hundred rods of the boundary line thereof, with the same moral certainty as they must prove the fact of the homicide itself." The court did rule that the government must prove that fact, and that the proof of it would " be governed by the same principles which are announced as to the reasonable degree of certainty with which proof must be made; " and adopted the instruction requested, with the exception of the words " the same moral certainty," which the court declined to use. To the omission to use these words, the defendant excepted.

The phrase " moral certainty " has been introduced into our jurisprudence from the publicists and metaphysicians, and signifies only a very high degree of probability. It was observed by Pufendorf, that, " when we declare such a thing to be morally certain, because it has been confirmed by creditable witnesses,

this moral certitude is nothing else but a strong presumption grounded on probable reasons, and which very seldom fails and deceives us." Law of Nature & Nations (Eng. ed. 1749) book 1, *c.* 2, § 11. "Probable evidence," says Bishop Butler, in the opening sentence of his Analogy, "is essentially distinguished from demonstrative by this, that it admits of degrees, and of all variety of them, from the highest moral certainty to the very lowest presumption."

Proof " beyond a reasonable doubt " is not beyond all possible or imaginary doubt, but such proof as precludes every reasonable hypothesis except that which it tends to support. It is proof " to a moral certainty," as distinguished from an absolute certainty. As applied to a judicial trial for crime, the two phrases are synonymous and equivalent; each has been used by eminent judges to explain the other; and each signifies such proof as satisfies the judgment and consciences of the jury, as reasonable men, and applying their reason to the evidence before them, that the crime charged has been committed by the defendant, and so satisfies them as to leave no other reasonable conclusion possible.

Accordingly, in *Commonwealth* v. *Webster*, 5 Cush. 295, in which the jury were instructed that the burden of proof was on the prosecutor, and that they must be satisfied to a reasonable and moral certainty that the defendant had committed the murder for which he was indicted, Chief Justice Shaw concluded this part of his charge as follows: " If, upon such proof, there is reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal. For it is not sufficient to establish a probability, though a strong one, arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary · but the evidence must establish the truth of the fact to a reasonable and moral certainty; a certainty that convinces and directs the understanding, and satisfies the reason and judgment, of those who are bound to act conscientiously upon it. This we take to be proof beyond reasonable doubt; because if the law, which mostly depends upon considerations of a moral nature, should go further than this, and require absolute certainty, it would exclude circumstantial evidence altogether." See also *Commonwealth* v. *Goodwin*, 14 Gray, 55. Baron Parke, in a case tried before him, expressed the same thought conversely,

thus: "Such a moral certainty as convinces the minds of the tribunal, as reasonable men, beyond all reasonable doubt." *Regina* v. *Sterne*, cited in Best on Ev. § 95, and 3 Greenl. Ev. § 29. And instructions that the jury should be satisfied of the defendant's guilt beyond a reasonable doubt have often been held sufficient, without further explanation. *Commonwealth* v. *Tuttle*, 12 Cush. 502. *Commonwealth* v. *Cobb*, 14 Gray, 57. *Commonwealth* v. *Harman*, 4 Penn. St. 269, 274. *Regina* v. *White*, 4 F. & F. 383, & note.

As already observed, the only exception taken upon this point at the trial was to the refusal of the court to rule in the exact form requested. But when, as in this case, the instructions given to the jury are legal and appropriate, and cover the whole ground of the instruction asked for, the omission or refusal of the court to rule in the very terms requested by counsel affords no ground of exception. When several forms of expression are equally accurate, it is within the discretion of the court at the trial to choose that form which it deems best adapted to make the rule of law intelligible to common minds. *Kelly* v. *Jackson*, 6 Pet. 622. *Morris* v. *Bowman*, 12 Gray, 467. *Blake* v. *Sawin*, 10 Allen, 340. *State* v. *Reed*, 62 Maine, 129.

5. It was argued that the charge was erroneous in authorizing the jury to convict upon this indictment in Norfolk, if the pistol was fired in Suffolk more than one hundred rods from the dividing line between the two counties, and the death ensued in Suffolk within one hundred rods of that line. No such exception was taken at the trial, or, if it had been, could be sustained.

By the Gen. Sts. *c.* 171, § 17, an "offence committed on the boundary of two counties, or within one hundred rods of the dividing line between them, may be alleged in the indictment to have been committed, and may be prosecuted and punished, in either county." The manifest intent and effect of this enactment are that the boundary line between two counties, and a strip one hundred rods wide on each side of that line, may be treated, for the purposes of allegation, prosecution and punishment, as being in either county; or, in other words, that each county, for these purposes, may be deemed to extend one hundred rods into the county adjoining. And this definition of the extent of each county must apply to the next succeeding section,

§ 18, which provides that if a mortal wound is given in one county, by means whereof death ensues in another county, the offence may be prosecuted and punished in either county.

6. The finding of the body, with the marks upon it of injuries sufficient to cause death, in a river in the heart of the county of Norfolk, in such a situation and condition as to show that it must have been thrown there by the hand of man, and not drifted there by the force of the tide or current, was sufficient to warrant the jury in concluding that the homicide was committed in that county. The twelfth instruction and the other rulings requested upon this point were therefore rightly refused.

In the cases cited for the defendant, in which the uttering of a forged bill was held to be insufficient evidence that it was forged in the same county, the bill either purported to have been made in another county, or bore date long before the uttering and when the defendant resided in another county. *Commonwealth* v. *Parmenter*, 5 Pick. 279. *Rex* v. *Parkes*, 2 Leach, (4th ed.) 775. *Rex* v. *Crocker*, 2 N. R. 87 ; *S. C.* 2 Leach, 987 ; Russ. & Ry. 97. In the absence of such circumstances, the rule has been held otherwise even in cases of forgery. *United States* v. *Britton*, 2 Mason, 464. *State* v. *Morgan*, 2 Dev. & Bat. 348. *Johnson* v. *State*, 35 Ala. 370. And the cases relating to a paper which may easily be carried in the pocket do not apply to a subject so difficult of transportation as a dead body.

7. The instructions as to the proof of the cause of death were accurate and sufficient.

For the reasons already given, the court was not obliged to give the sixth instruction requested, and fully covered the subject of that request by ruling that " the government must prove, in the way all necessary facts are proved in criminal trials, that the pistol wound given by the prisoner, if given by him, was the cause of the death of Julia Hawks," and that " if, while alive, another cause came in which, independently of the pistol wound, caused the death, so that the death resulted from that, and not from the pistol wound, then the jury cannot here find a verdict of homicide from the cause alleged in this indictment."

The seventh instruction requested assumed that if " any other cause of death intervened so as to hasten her death in any degree, then, in contemplation of law, the pistol wound was not the cause

of the death." Such an instruction would be erroneous, and likely to mislead the jury. The law is well settled that if a wound is feloniously inflicted with a deadly weapon in such a manner as to put life in jeopardy, and death ensues as a consequence of that act, the fact that the negligence of the deceased, or improper and unskilful treatment of surgeons, hastens, or co-operates in producing, the fatal result, does not palliate or excuse the felonious act. *Commonwealth* v. *Hackett,* 2 Allen, 136, and authorities cited. *Regina* v. *Minnock,* 1 Crawford & Dix, 45. *McAllister* v. *State,* 17 Ala. 434. So in this case, if the effect of the circumstances intervening between the pistol wound and the death was merely to prevent any recovery that might otherwise have taken place, or to aggravate or hasten the effect of the pistol wound, that wound might still be considered the cause of the death, and indictable and punishable as such.

8. The court rightly refused to rule either that the want of evidence tending to show that the homicide was committed in Suffolk or Plymouth was, or that it was not, evidence upon the question whether the homicide was committed in Norfolk; and properly submitted that question to the jury upon all the circumstances of the case. Evidence having been introduced, strongly tending to show that the homicide was committed by the defendant in Norfolk, the jury were rightly instructed that if they thought that, if it had been committed elsewhere, the defendant would have the means of showing it by other witnesses, they might consider the absence of evidence that it was committed in another county. *The King* v. *Burdett,* 4 B. & Ald. 95, 122, 140, 141, 150, 161, 162. *Commonwealth* v. *Webster,* 5 Cush. 295, 316. *Commonwealth* v. *Harlow,* 110 Mass. 411, 412. *People* v. *Dyle,* 21 N. Y. 578. Stark. Ev. (4th ed.) 846.

9. The court, having submitted to the consideration of the jury all the evidence of the relations and intercourse between the prisoner and the deceased for six months before the homicide as explaining the conduct of the parties, was not required to make a distinct ruling upon the point whether there was or was not evidence of an actual engagement of marriage between them.

10. The tenth instruction requested was submitted to the jury with proper qualifications. The considerations stated and the authorities cited under the eighth point are decisive of this.

11. The rulings as to the determination by the jury of each material fact essential to the conviction were unexceptionable. It is not true, as contended for the prisoner, that their finding of any one fact to be proved must not be taken to aid in, or be connected with, the determination of any other. If the jury were satisfied that he shot the pistol, that fact would necessarily aid them, in connection with the evidence of his whereabouts, in determining the question of malice, and might aid them in fixing the time and place at which, as well as the means by which, the homicide was committed.

12. In Massachusetts, it has never been the right of a party, in any case, civil or criminal, to have the jury polled. The affirmance of the verdict by the whole jury in the usual manner, upon its being read to them in form by the clerk, with the opportunity of open dissent thereby afforded to each juror, has been deemed sufficient security that the verdict thus affirmed expresses the unanimous decision of the jury. *Ropps* v. *Barker,* 4 Pick. 239. *Commonwealth* v. *Roby*, 12 Pick. 496. The *case of Roby*, in which this point was determined more than forty years ago, was a capital case.                              *Exceptions overruled.*

The defendant, having been sentenced to death, applied to the chief justice, by a petition filed June 1, 1875, for a writ of error, and assigned the following errors in the record and proceedings of the court :

" 1. That it does not sufficiently appear in and by the said record that prior, and as a preliminary to the appointment of a time for the arraignment of the said James H. Costley upon the said indictment, the clerk of the said Supreme Judicial Court for the county of Norfolk sent any notice to the chief justice of the said court, or to the attorney general, that the said indictment had been transmitted to the said court, or sent any copy thereof to the said chief justice and the attorney general.

" 2. That it does not appear that any time for the arraignment of the said Costley upon the said indictment was appointed according to law.

" 3. That it does not appear that the said Costley was at any time arraigned upon the said indictment before the said Supreme Judicial Court, or that he was arraigned thereupon in any manner according to law.

" 4. That if it does appear that a time for the arraignment was lawfully appointed, and that the said Costley was arraigned upon the said indictment, it does not appear that he was arraigned at the time appointed.

" 5. That neither the sentence pronounced, nor the judgment rendered by the said court on the indictment aforesaid, is warranted by, or in accordance with, the Constitution and laws of this Commonwealth, but that each is contrary thereto.

" 6. That it appears by the record aforesaid that the judgment aforesaid has been given for the said Commonwealth against the said James H. Costley, whereas by the law of the land it ought to have been given for the said James H. Costley against the said Commonwealth."

The petition was accompanied by an affidavit of the petitioner that the same was not intended by him for the mere purpose of procuring delay in the execution of the judgment therein mentioned, but because he was advised by the counsel assigned him by the court, that in their opinion the said errors assigned were of such grave importance, that he should have them presented to this court for its decision.

The case was reserved, for the consideration of the full court, upon the petition and a copy of the record.

The record, after stating in due form the finding of the indictment, its service upon the defendant, and transmission to this court, proceeded thus :

" And on the tenth day of December, A. D. 1874, the Honorable Horace Gray, Chief Justice of said Supreme Judicial Court, appointed a time for the arraignment of the said James H. Costley, as follows, to wit : ' Commonwealth of Massachusetts. Norfolk, ss. Supreme Judicial Court. In Vacation. *Commonwealth* v. *James H. Costley.* Whereas an indictment against James H. Costley for the crime of murder has been transmitted by the Superior Court for the county of Norfolk to the Supreme Judicial Court in said county, and entered in said last named court, and notice thereof sent to the chief justice of said Supreme Judicial Court and to the attorney general, with a copy of said indictment : It is ordered that Monday, the fourteenth day of December, 1874, at nine and one half o'clock in the forenoon, at the court house in Dedham in said county, be and hereby is ap-

pointed as the time and place for arraignment of the prisoner named in said indictment.    December 10, 1874.

" Horace Gray, Chief Justice.

" And in obedience to said order, on the fourteenth day of December in the year of our Lord one thousand eight hundred and seventy-four, at the court house in Dedham in said county, the said James H. Costley was brought in by the sheriff of said county before the Honorable John Wells, one of the justices of said court.    And the said James H. Costley, having the indictment read to him, for plea said that thereof he was not guilty, and for trial put himself upon the country."

The record then recited the assignment of counsel, the motion to quash, empanelling of the jury, trial and verdict, filing and overruling of the exceptions, and the bringing up of the prisoner for sentence, and concluded as follows :

" It is considered and ordered by the court that the said James H. Costley, convict as aforesaid, be taken from this place to the common jail of the county of Norfolk, there to remain in close custody until such day as the executive government of said Commonwealth shall by their warrant appoint, and then he be thence removed to the place of execution, there to be hanged by the neck until he be dead."

*H. R. Cheney*, for the petitioner.    1. If the arraignment was irregular, it is error.    2 Hawk. *c*. 28, § 5.    *Commonwealth* v. *Hardy*, 2 Mass. 303.    *Regina* v. *Fox*, 10 Cox C. C. 502.    *Powell* v. *United States*, 1 Morris, 17.

The prisoner was not lawfully arraigned.    It does not appear that the clerk sent the required notice and copies of the indictment to the chief justice and attorney general.    The St. of 1869, *c*. 433, makes the sending of such notice and copies prerequisites to the appointment of a time for the arraignment.    Unless these are complied with there is no jurisdiction.    *Seymour* v. *Judd*, 2 Comst. 464.    If the notice and copies were sent, it should so appear by the certificate of the clerk.    The proper evidence of the service of any notice or other process is the return or certificate of the officer whose duty it is to serve it.    3 Bl. Com. 273.

The arraignment was in vacation, at chambers, and not before the court.    This was authorized, if at all, by the St. of 1869,

*c.* 433. But this statute does not authorize such an arraign-
ment, for it does not repeal, but expressly recognizes the prior
provisions on this subject. Gen. Sts. *c.* 112, §§ 5, 8. Repeal by
implication is not to be favored, but strong terms are required to
effect such repeal *Haynes* v. *Jenks,* 2 Pick. 172, 176. *Goddard*
v. *Boston,* 20 Pick. 407, 410. Sedgw. Stat. and Const. Law, (2d
ed.) 98 & note. By the Gen. Sts. there must be an arraignment
before the court. " Trials of indictments for capital crimes shall
be heard and determined by the full court." *c.* 112, § 5. In
*Hardy's Case, ub. sup.* it was held that this included the arraign-
ment. After that decision it was provided that the prisoner might
be arraigned before the court held by a single justice. *c.* 112, § 8.
But it must still be before the court. The term " arraignment "
imports a proceeding by and in the presence of the court. To
arraign is to call to the bar of the court to answer to the in-
dictment. 2 Hale P. C. 216. 4 Bl. Com. 322. The justice be-
fore whom the arraignment was made was not at that time the
court, and the record does not profess to set out any arraignment
before the court. A justice of the court is not the court, except
when upon the bench, as the court, in term time and after due
proclamation. Burrill's Law Dict. tit. Court. Bouvier's Law
Dict. tit. Court. If the statute authorizes an arraignment at
chambers, it also authorizes sentence of death at chambers, in
case the accused pleads guilty. Gen. Sts. *c.* 112, § 8, last clause.
It cannot be supposed that the legislature intended this. The St.
of 1869 must be construed in connection with the provisions of
the Gen. Sts. *c.* 112, §§ 5, 8. They are to be construed as one
statute. The true intent of the St. of 1869, so construed, is,
that the arraignment may be at a special session ordered and held
by a single justice in vacation time. The power to call such
special session is necessarily implied.

The arraignment is an important and essential part of the
hearing, trying and determining of an offence. *Hardy's Case,*
and *Powell* v. *United States, ubi supra.* It is a judicial proceed-
ing, and must be performed by the court. Upon the construction
of the statute, which was acted upon in this case, it would au-
thorize a private arraignment. If it is competent for the legis-
lature to make the arraignment private, they may also make any
other part of the trial private.

The time appointed for the arraignment was " nine and one half o'clock in the forenoon." It does not appear whether the prisoner was arraigned at that hour or some other. The record should show a strict compliance with the order. Statutes prescribing modes of procedure must be followed with precision and exactness. *Queen* v. *Mayor, &c. of Leeds,* 11 A. & E. 512. *Seymour* v. *Judd, ub. sup.* Sedgw. Stat. & Const. Law, 275 *& seq.* Dwarris on Sts. 477. Statutory provisions in derogation of a common law right are to be strictly construed and followed, particularly when they affect life or liberty, or are in any way penal. *Melody* v. *Reab,* 4 Mass. 471. Sedgw. Stat. & Const. Law, 267, 287, note & cases cited.

2. The sentence was erroneous. The power of making out and awarding execution in criminal as well as civil cases, and of doing all things necessary thereto, is delegated to the courts by the Constitution. Const. c. 1, § 1, art. 3. This includes the power and duty to fix the time and place, and the Legislature cannot delegate that power to another branch of the government.

When a power is granted in the Constitution to one department of the government, there is an implied prohibition of it to every other department. Cooley's Const. Lim. 87, 88. The Constitution expressly prohibits the executive to exercise judicial power. Declaration of Rights, art. 30.

*C. R. Train,* Attorney General, *& W. G. Colburn,* Assistant Attorney General, for the Commonwealth.

GRAY, C. J. By the Gen. Sts. c. 146, § 13, no writ of error can issue upon a judgment for a capital offence, unless allowed by one of the justices of this court. The present case was reserved upon the petition for the writ, in order that a speedy hearing and determination of the questions of law involved might be had in the full court, in substantial accordance with the course pursued in *Webster* v. *Commonwealth,* 5 Cush. 386. The attorney general having had notice of the application, and the errors assigned having been fully argued, we are all of opinion that no cause is shown for issuing the writ.

The errors assigned relate either to the arraignment of the prisoner or to the form of the sentence.

1. Those relating to the arraignment depend upon the construction and effect to be given to the St. of 1869, c. 433, § 2.

Upon the transmission of the indictment by the clerk of the Superior Court to this court, this court has jurisdiction of the case. The provision of the St. of 1869, for the transmission of notice and a copy of the indictment to the chief justice and the attorney general, like the similar provision of the Gen. Sts. c. 171, § 23, is merely directory, and does not affect the jurisdiction of the court. *Webster* v. *Commonwealth*, 5 Cush. 402, 403. But in this case the record shows that the directions of the statute were fully complied with.

At the time of the decision in *Commonwealth* v. *Hardy*, 2 Mass. 303, cited for the petitioner, the statute (St. 1804, c. 105) required all indictments found for a capital offence to be "heard, tried and determined exclusively" in a court holden by three or more justices, and made no special provision as to the arraignment; and it was therefore held that the arraignment of the prisoner and his plea, having been before one justice only, were "not *coram judice*," and judgment was arrested. By subsequent statutes, and the practice for many years in accordance with them, the defendant was arraigned, and, if he pleaded guilty, sentence was awarded, by the court held by one justice. Sts. 1820, c. 14, § 8; 1832, c. 130, § 6. Rev. Sts. c. 136, § 21. Gen. Sts. c. 112, § 8. *Webster* v. *Commonwealth*, 5 Cush. 394. *Green* v. *Commonwealth*, 12 Allen, 155.

The St. of 1869, c. 433, § 2, expressly authorizes any justice of this court to appoint a time "for the arraignment of the prisoner upon the indictment, which time may be either in term time or vacation." It then further provides that "the proceedings upon the arraignment of the prisoner, and all other proceedings in the case, shall be as is now provided by law." And by § 4 all inconsistent provisions of law are repealed.

This statute does not authorize one justice in vacation to do anything more than arraign the prisoner. If the arraignment is in vacation, the jurisdiction of the judge is exhausted when the prisoner has had the indictment read to him by the clerk, and being called upon to plead, has pleaded thereto, and had counsel assigned him; the judge has no authority to award sentence or to proceed to trial; because so much of the Gen. Sts. c. 112, § 8, as provides for the awarding of sentence by the court held by one justice on a plea of guilty, and of §§ 5, 9, as requires the trial to

be had before a full court, were not inconsistent with the St. of 1869, nor repealed thereby, and still remain in force, except so far as the latter are modified by the St. of 1872, c. 232, conferring upon two or more justices the powers of a full court on the trial of indictments for murder.

But the arraignment before one judge in vacation at a time appointed pursuant to the St. of 1869 is, by force of this statute, *coram judice*, before a judge, and in a manner authorized by the Legislature. The fact that the court is not so organized as to exercise any further common law jurisdiction over this case or any other does not affect the validity of the arraignment, or infringe any constitutional right of the defendant.

The appointment of the time for arraignment, being made by a judge out of court, and not requiring the presence of the defendant or the clerk or any other person, the certificate under the hand of the judge is the appropriate evidence of the fact of such appointment, as well as of the preliminary fact that the notice and copy of the indictment have been sent to the chief justice and the attorney general. At the arraignment, whether it is in term time or vacation, the clerk is present for the purpose of reading the indictment to the prisoner. The record of the case, when finally extended by the clerk, properly includes the judge's certificate appointing the time, as well as a statement of the actual arraignment at the time appointed.

The arraignment in this case, having been appointed, as appears by the judge's certificate, to be had at the court house of the county at a certain day and hour, might, as in the case of all judicial proceedings in the higher courts, be had at that or any subsequent hour on the same day. And the record, stating that, in obedience to said order, on that day and at the court house, the defendant was brought in by the sheriff before one of the justices, and having the indictment read to him, pleaded not guilty, and for trial put himself upon the country, shows that he was so arraigned.

2. The only objection to the sentence is that it leaves the time of execution to be determined by the Governor and Council; and it is contended for the petitioner that the determination of that time is an exercise of judicial power, which by the Constitution of the Commonwealth is delegated to the courts, and cannot be referred to another branch of the government.

But the issue of an execution in any case, criminal or civil, is not an exercise of judicial power, but a mere ministerial act, which may be authorized by law to be done by the clerk. And the fixing of the time and place of execution is no part of the judgment or sentence of death, and may be regulated by statute, so as to be done by order of the court contemporaneously with the sentence, or by the Governor and Council, or even, as by the common law of England, left to the discretion of the sheriff. *Rex* v. *Rogers*, 3 Bur. 1809, 1812. *Atkinson* v. *The King*, 3 Bro. P. C. (2d ed.) 517. *Ex parte Howard*, 17 N. H. 545, 548. *Cathcart* v. *Commonwealth*, 37 Penn. St. 108, 115.

By a colonial statute of 1668, it was provided that the secretary or clerk of every court should sign all warrants for the execution of sentences of death, as of all other judgments, civil or criminal. 4 Mass. Col. Rec. pt. 2, 394 ; Mass. Col. Laws, (ed. 1672) 30 ; Anc. Chart. 81. Under the Province Charter, a like practice prevailed in capital cases, and the court usually fixed the time of execution. *The King* v. *Ames*, Rec. 1773, fol. 118. *Webster* v. *Commonwealth*, 5 Cush. 407.

But within a year after the Declaration of Independence it was enacted by the Legislature of Massachusetts that no person, on whom sentence or judgment of death should be passed, should be executed and put to death in pursuance of such judgment, before the whole record of the case should be certified by the clerk of the court under the seal thereof to the supreme executive authority of this state, nor until a warrant should be issued by said supreme executive authority under the great seal of this state, with a copy of the record thereto annexed, directed to the sheriff of the county in which the trial was had, commanding him to cause execution to be done according to the judgment. St. 1777, c. 32, § 24 ; Mass. State Laws, 1775–1780, 111.

That statute remained in force until the passage of the Revised Statutes, and is reënacted in the Rev. Sts. c. 139, § 11, and the Gen. Sts. c. 174, § 24. Since its passage, both before and since the adoption of the Constitution, the court has never fixed the time of execution of a sentence of death, but has always left it to the determination of the executive. *Government & People* v. *Jones*, Rec. 1778, fol. 214. *Government & People* v. *Brooks*, Rec. 1778, fol. 227. *Government & People* v. *Young*, Rec. 1779, fol. 114.

*Government & People* v. *Green*, Rec. 1779, fol. 135. *Common-wealth* v. *Lobdell*, Rec. 1781, fol. 88. *Webster* v. *Commonwealth*, 5 Cush. 407.

If any doubt could be entertained of the conformity of this mode of proceeding to the Constitution of the Commonwealth, as a matter of abstract theory — and we entertain none — the practical construction of nearly a century is conclusive. *Commonwealth* v. *Lockwood*, 109 Mass. 323. *Petition dismissed.*