## COMMONWEALTH *vs.* FRANCISZEK UMILIAN.

Hampshire.   January 18, 1901. — February 26, 1901.

Present: HOLMES, C. J., KNOWLTON, MORTON, BARKER, & LORING, JJ.

In this case the defendant was found guilty of murder in the first degree, and it was held that the evidence warranted the verdict.

INDICTMENT, for murder, returned June 12, 1900.

At the trial in the Superior Court, before *Sherman* and *Stevens,* JJ., the defendant at the close of the evidence asked the judges to rule and instruct the jury : first, that there was not sufficient evidence to warrant the jury in finding a verdict of guilty ; and, second, that there was not sufficient evidence to warrant the jury in finding a verdict of guilty in the first degree. The judges declined to give either of these rulings.

The jury found a verdict of guilty of murder in the first degree ; and the defendant alleged exceptions.

*J. B. O'Donnell,* for the defendant.

*J. C. Hammond,* District Attorney, for the Commonwealth.

KNOWLTON, J.   The defendant was found guilty of murder in the first degree, and the only question before us is whether there was any evidence to warrant the verdict.

He and Casimer Jedrusik were working together as farm laborers for one Keith in Granby. On Sunday, December 31, 1899, Jedrusik disappeared, and was never afterwards seen alive. On April 10, 1900, his headless, mutilated body was found enclosed in a bran sack in an unused well between four hundred and five hundred feet from Keith's horse barn. His clothing was found enclosed in another sack in the same well. His skull was afterwards found buried in the cellar of the horse barn. The sacks were similar to those which Keith had in the horse barn. The stone, which was enclosed in the sack of clothing, exactly fitted a vacant place in a stone wall about in line between the old well and the north door of the horse barn. On the day of the disappearance there was no snow on the ground, and the surface of the ground was entirely frozen. In the cellar of the horse barn pigs were kept, and there was soft mud

there.  The clothing which was exhibited to the jury had mud upon it which the Commonwealth contended on the evidence was like that in the cellar.  Mr. and Mrs. Keith drove away to church on December 31, leaving the defendant and Jedrusik about the barn.  The defendant's wife was in the house, where she was employed as a housemaid, and there was evidence tending to show that the only other person who came there during that day was a young woman who came to visit her.  The defendant was outside of the house, about the premises, for some hours after Mr. and Mrs. Keith went to church, and when he came in he said that Jedrusik had gone to Granby.  There were wounds on the head of Jedrusik, which the Commonwealth contended were made by a corn cutter that was in the horse barn, and was exhibited to the jury.  The evidence tended to show that the defendant had ample opportunity to commit the murder, and that no other person had an opportunity to do it without discovery.

On November 18 the defendant went to Chicopee to the house of a Polish priest, to have the ceremony of marriage performed between him and a young woman who had been living as a maid at Keith's house, and he found that the priest had received a letter in a name which proved to be fictitious, charging him with having a wife and children in the old country, and with receiving letters from his wife asking for money for the support of herself and her children.  The priest refused to marry him, and sent a trusted person with him to investigate.  It turned out that Jedrusik wrote the letter, and that its contents did not appear to be true.  The defendant was then married by the priest, and the evidence tended to show that he was very angry with Jedrusik, and that he made strong threats of vengeance against him.  There was evidence from several witnesses that at different times between the defendant's marriage and Jedrusik's disappearance, the defendant manifested deeply hostile feelings towards him, and made threats against him.  On the morning of December 31 there was a new manifestation of this feeling in charges made to Mr. Keith that Jedrusik had stolen a plane and had stolen butter.  There was evidence that, between the time of the disappearance and the discovery of the body, the defendant was seen to take up one of the planks cov-

ering the unused well and to look down into the well, and also that when he was told in the daytime that Keith and one Olds had gone out of the house with a lantern, he said he "knew what they were going to do. Mr. Olds wants to buy the pump in the old well." There was evidence that nothing had ever been said by Olds about buying the pump. Immediately after being told this the defendant went into the horse barn, and was seen looking out of a window from which the well could be seen. When others went to the well after the body was found, he did not go. There was also evidence that about the middle of January he gave away Jedrusik's rubber boots, and said that he did not think Jedrusik would come back. There were many other things in his language and conduct after Jedrusik's disappearance which the Commonwealth relied on as tending to show guilty knowledge, and much of his testimony in explanation of facts was in direct contradiction of other witnesses.

Without going more at length into the evidence, which was voluminous, we are of opinion that it would have been error to take the case from the jury. So far as we can judge from the bill of exceptions the evidence well warranted the verdict.

*Exceptions overruled.*