COMMONWEALTH *vs.* DOMENICK L. BONOMI.

Plymouth. October 1, 2, 1956. — January 31, 1957.

Present: WILKINS, C.J., RONAN, SPALDING, WILLIAMS, & WHITTEMORE, JJ.

*Homicide. Practice, Criminal,* Venue; Examination of jurors; Exceptions: whether error harmful; New trial. *Jury and Jurors. Evidence,* Of state of mind; Opinion: expert; Irresponsive answer; Cumulative evidence; Competency; Relevancy and materiality; Exhibit; Consciousness of guilt; Photograph; Conversation; Admissions and confessions; On cross-examination; In rebuttal; Presumptions and burden of proof. *Error,* Whether error harmful.

There was no error in the denial of a motion for a change of venue for the trial of an indictment for murder notwithstanding newspaper articles, submitted in support of the motion, containing inaccurate accounts of the alleged murder and misstatements of the evidence to be presented at the trial. [332–333]

Commonwealth *v.* Bonomi.

There was no error at the trial of a capital case in the denial of a request by the defendant that the judge propound questions to prospective jurors in addition to the required statutory questions.   [334–335]

At the trial of a defendant for the murder of his wife on a certain day between a time when he drove their daughter to an entertainment in another town and a time when he picked her up there several hours later, questions by the district attorney on direct examination of the daughter as to how her father appeared when he left her and whether she noticed "any difference in . . . [his appearance respecting] happiness or nervousness or anything else" between the time he left her and the time he picked her up were competent.   [339]

There was no harm to the defendant at a criminal trial in a refusal to strike out an irresponsive answer to a question to a witness where the answer added nothing to other facts in evidence.   [340]

At the trial of a defendant for murdering his wife on a certain day at a specified time, there was no error in permitting their daughter to testify that the defendant in a conversation with her uncle shortly after that time stated that he did not know where his wife then was.   [340]

At the trial of a defendant for murdering his wife on a certain day at a specified time, testimony of certain witnesses as to what they had seen at that time in front of the wife's home was competent, although they were then passing by her home in an automobile.   [340]

Testimony by the proprietor of a shop at which the defendant in a criminal trial had stopped shortly before the time when the crime allegedly was committed, that the defendant had appeared "extremely nervous and in a hurry," was competent even though the witness had not known the defendant before he stopped at the shop.   [340]

At the trial of an indictment for a murder by means of a blunt instrument on a day when the defendant was seen to throw some articles onto a fire, there was no error in the admission of evidence that on the following day the iron head of a tamping stick capable of lethal use and like one used by the defendant in his business was taken out of the fire, although there was no direct proof that that piece of iron was the instrument used in the commission of the crime; nor was there error in the admission in evidence of the piece of iron itself.   [341]

A can given to a police officer for examination in which workmen had collected pieces of paper torn up and thrown on the ground by their employer on the day of a murder was admissible at his trial for the murder.   [341]

At the trial of an indictment for murder by means of a blunt instrument, evidence was properly admitted that fire would obliterate possible traces of blood from a piece of iron capable of use in the commission of the crime and removed from a fire on the day following the day on which the murder was committed and on which the defendant was seen to throw articles onto the fire.   [341]

At a trial for murder of a woman whose body was found covered by gravel in a culvert by a road at a place where a load of gravel purchased by the defendant had been dumped from a truck under his

instructions on the day of the murder, evidence was properly admitted that the defendant, who conducted a construction business, had never purchased a "single" load of gravel before; and a picture of the dump truck was properly admitted to show how its hoist operated. [341–342]

At the trial of a defendant for the murder of his wife on a certain day at a specified time, evidence that shortly after that time the defendant talked with two police officers, whom he scarcely knew, about troubles with his wife was material. [342]

At the trial of a defendant for murdering his wife on a certain day, there was no error in the admission in evidence of an incident occurring two weeks before that day involving the defendant, his wife and another woman and leading to a complaint of assault and battery by the wife against the defendant, or in the admission of a certified copy of the complaint, restricted in evidential use to proof of the fact that the complaint was made. [343]

At the trial of a defendant for the murder of his wife on a certain day evidence was properly admitted that three days later the defendant had witnesses listen on a telephonic answer recorder in his office to the voice speaking on an incoming call recorded two days after the alleged day of the murder, which the defendant strenuously insisted and the witnesses denied was the voice of his wife; and the recorder and its accompanying ear phones were properly admitted as exhibits. [343–344]

At the trial of a defendant for murdering his wife on a certain day, the substance of a telephone conversation three days later between the defendant and another woman was properly admitted to show his attitude toward his wife and his relation to the other woman. [344]

At the trial of a defendant for the murder of his wife, there was no error in the admission in evidence of the facts that at the time of the alleged murder there were pending a libel for divorce brought by the defendant and a petition for separate support brought by his wife and that a hearing had been held on the petition, or in the admission of a temporary order issued on the petition and of a statement made by the defendant on hearing the terms of the order that he pay her a certain sum weekly, "I'll never pay that." [344–345]

At the trial of a defendant ordered to pay his wife a certain sum weekly by way of separate support and subsequently indicted for her murder, evidence that the defendant said to the guardian ad litem of their children after she had disappeared that she had "gone mental" and asked who could then enforce the order was properly admitted. [345]

A conversation with one on the day after his wife disappeared, in which he stated that she was "too yellow to commit suicide," was properly admitted in evidence at his trial for murdering her. [345]

At the trial of a defendant for murdering his wife, a record kept in the usual course of business showing a completed telephone call to his wife's home, inferably from their daughter, was admissible to fix the time he had left the daughter in another town shortly before the murder was committed. [345]

Evidence that some months before the murder of a woman her husband called her an opprobrious name and threatened to "break every bone in her body" if she did not produce a certain bank book was properly admitted at his subsequent trial for the murder. [345–346]

At the trial of an indictment, evidence relating to the defendant being in touch with a person who brought certain evidence to court was immaterial but harmless. [346]

At the trial of an indictment for murder of a woman by means of a blunt instrument at which witnesses testified that a man in khaki clothes struck a woman on the ground in front of the victim's home, photographs of a blunt instrument as it lay in the place where it was found and of the defendant dressed in khaki clothes were properly admitted in evidence. [346]

At the trial of a defendant for murdering his wife on a certain day, the substance of statements made by the defendant to police as to his activities on that day was admissible as an admission. [346–348]

Evidence of a failure of one, whose wife's body was found covered by gravel five days after she had disappeared, to tell police, when questioned shortly after her disappearance, about his purchase of gravel on the day she disappeared was admissible to show an admission at his trial for her murder. [348]

A diary of a defendant purporting to state his activities on a day on which, the Commonwealth alleged, he committed a crime was admissible at his trial for the crime. [348]

At a criminal trial at which the time it took to drive by automobile between certain places was material, a police officer was properly allowed to testify as to the time it took him to drive between them at a stated rate of speed. [349]

At a trial for a murder committed on a certain day during a specified time, at which there was evidence that during that time the defendant made out a charge slip himself for gasoline he then purchased from a filling station, there was no error in allowing the operator of the station to testify as to the defendant's usual custom when making purchases. [349]

At the trial of a defendant for murdering his wife, at which there was evidence of a fatal attack on the wife by a man at her home at a time of day earlier than a time when, the defendant told police, he had driven up to his wife's home and had been given their baby by her for the afternoon, testimony by the occupant of the house next door that she was sitting at her window and did not see the defendant drive up at the time so stated by him, and a photograph of the wife's front yard taken from that window, were properly admitted in evidence. [349]

A certain question by the district attorney on direct examination of the defendant's bookkeeper at a criminal trial was not incompetent as hearsay since it related to a matter which might have been found to be within the bookkeeper's knowledge. [349–350]

Certain statements by the defendant in a murder case to a witness were admissible as evidence of a guilty conscience. [350]

No error appeared on the record of a murder trial in allowing the district attorney on direct examination of the physician who had performed an autopsy on the victim to ask, after the physician had testified with respect to the autopsy, whether it was his conclusion that at some time before death the victim had consumed meat and to ask a certain hypothetical question as to how long after eating death could have occurred, although the hypothetical question omitted an article of food eaten. [350–351]

Certain statements made by the defendant in a murder case to police in interrogations six days after the victim, his wife, had disappeared and the day after her body was found were in the nature of admissions or were attempts to place responsibility for her murder on others and were properly admitted in evidence at the trial, together with testimony as to his appearance and conduct during the interrogations. [351–353]

At a trial for the murder of a woman whose body was found under gravel and water in a culvert, a certificate of a weather bureau twelve to fourteen miles away from the culvert as to rain fall was admissible in the trial judge's discretion. [353]

Testimony with respect to information leading a witness at a criminal trial to a place where he observed certain things to which he testified did the defendant no harm. [353]

A cement block taken from a truck by the defendant in a murder case on the day of the crime and similar to a block later found under the head of the victim was admissible at the trial. [353]

The admission of questions at a criminal trial on cross-examination of the defendant and of witnesses called in his behalf was a matter within the discretion of the trial judge. [354]

A man experienced in dealing with gravel was properly allowed, at a trial for murder of a woman whose body was found covered by gravel in a culvert, to testify for the Commonwealth in rebuttal as to the similarity of that gravel to gravel in a pit which he was operating and from which the defendant, according to other evidence, purchased a load of gravel on the day of the crime. [354]

At the trial of a defendant for the murder of his wife, a verdict of guilty of murder in the first degree was justified on all the evidence, including evidence of hostility of the defendant toward and marital troubles with his wife and of an attachment he had formed for another woman, and circumstantial evidence warranting findings that on a certain day he arranged to have his wife alone at her house, that he struck her with a blunt instrument there on that day, inflicting injuries which, with strangulation by ligature, caused her death, and that he removed her body to a place where it was later found and concealed it by covering it with gravel. [355–356]

This court denied a motion for a new trial of an indictment for murder on the ground of newly discovered evidence set forth in affidavits supporting the motion where such evidence was not of a character to have had any substantial influence on the jury's verdict. [357]

INDICTMENT, found and returned on October 6, 1955.

The indictment was tried before *Smith, J.*

*Dwight L. Allison,* (*Frederick W. Harrington, Jr.,* with him,) for the defendant.

*John R. Wheatley,* District Attorney, (*Warren H. Lindberg,* Assistant District Attorney, with him,) for the Commonwealth.

WILLIAMS, J.   The defendant was found guilty of the murder in the first degree of his wife, Mildred H. Bonomi, without recommendation by the jury that the sentence of death be not imposed.   G. L. (Ter. Ed.) c. 265, § 2, as appearing in St. 1951, c. 203, and as amended by St. 1955, c. 770, § 78.   Sentence of death has been imposed and execution of sentence stayed as required by G. L. (Ter. Ed.) c. 279, § 4, as appearing in St. 1935, c. 437, § 3.   The case is before us on the defendant's appeal, pursuant to G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended, accompanied by a summary of the record, a transcript of the evidence, and assignments of error.   The indictment was in the form provided by G. L. (Ter. Ed.) c. 277, § 79, and charged that the defendant on or about August 31, 1955, "at a place in the County of Plymouth, the exact location of which is to the jurors unknown, did assault and beat Mildred H. Bonomi, with intent to murder her, and by such assault and beating did kill and murder Mildred H. Bonomi."   The Commonwealth specified in a bill of particulars that the victim came to her death between 12:30 P.M. and 4 P.M. on August 31, 1955, as a result of multiple injuries to the head inflicted by a blunt instrument and "strangulation by ligature."

The defendant seasonably moved for a change in the place of trial to some adjoining county alleging that a fair and impartial trial could not be had in the county of Plymouth because of (1) "local prejudice . . . created to the detriment of the defendant's constitutional right to a fair and impartial trial" and (2) "inflamed public opinion, provocative to anger, and bias which is rampant in said county."   In support of his motion he brought to the atten-

tion of the trial judge clippings from local and Boston newspapers containing inaccurate accounts of the alleged murder and misstatements of the evidence to be presented at the trial. The first assignment of error is to the denial of this motion. We cannot say that the judge was wrong in refusing to believe that it was practically impossible to empanel an impartial jury in the county where the murder was alleged to have occurred.

"In criminal prosecutions, the verification of facts in the vicinity where they happen, is one of the greatest securities of the life, liberty, and property of the citizen" (art. 13 of the Declaration of Rights of the Constitution of Massachusetts), and while under G. L. (Ter. Ed.) c. 277, § 51, there may be a change in the place of trial it should be ordered with "great caution and only after a solid foundation of fact has been first established." *Crocker* v. *Justices of the Superior Court,* 208 Mass. 162, 180. The newspaper accounts and comments submitted to the judge did not require a finding that the guilt of the defendant had been so generally and substantially prejudged by the residents of the county that an unbiased tribunal for the trial could not be obtained. It was not error to deny the motion. See *Commonwealth* v. *Millen,* 289 Mass. 441, 463–464; *Commonwealth* v. *Sheppard,* 313 Mass. 590, 594–595.

Assignments 2 to 16, inclusive, based on exceptions 1 to 6, inclusive, 10, 11, 13, 14, 16, 17, 19, and 22, relate to the denial of the defendant's request that the judge propound to each prospective juror as called the following questions. "1. Have you read any newspaper articles or any other publicity in connection with this case? 2. If you serve as a juror on this case, will your judgment be affected or your verdict in any way influenced by any articles you have read or may read or by any publicity that the case has received or shall receive? 3. Will anything you may have heard or read regarding this case or anything you may read in the future prevent you from returning a fair, unbiased, impartial verdict according to the law and the evidence? 4. Has your mind or judgment been so affected

by anything you have read or heard concerning this case
that you will thereby be unable to render a fair and im-
partial verdict?   5. Are you able to eliminate or put out
of your mind anything you have heard or read concerning
this case so that you are satisfied that despite what you
may have heard or read you will be able to render a fair
and impartial verdict according to the law and the evidence?
6. Are you able to eliminate and put out of your mind any-
thing and everything you have read or heard concerning
this case so that if, when the case is closed, you have a
reasonable doubt as to the guilt of the defendant, you will
give him the benefit of that doubt and return a verdict of
not guilty?   7. If after hearing the evidence and applying
the law as given you by the court, you entertain a reason-
able doubt as to the guilt of this defendant, will you give
him the benefit of that doubt and return a verdict of not
guilty?   8. If after hearing the evidence and the law as
given you by the court you have a reasonable doubt as to
the guilt of this defendant, would you permit or allow that
doubt to be overcome or affected in any way by any bias
or prejudice you might have towards this defendant?   9.
If after hearing the evidence and the law as given you by
the court you have a reasonable doubt as to the guilt of
this defendant, would you permit or allow that doubt to
be affected in any way by any impressions you may have
received from anything you may have heard or read outside
of the court room?   10. Are you satisfied that you are able
to render a fair and impartial verdict according to the law
and the evidence and to give the defendant the benefit of a
reasonable doubt and find him not guilty if you have such
a doubt?"   The judge asked each juror the required four
statutory questions (G. L. [Ter. Ed.] c. 234, § 28), and the
question made necessary by G. L. (Ter. Ed.) c. 278, § 3,
as to his qualification to serve as a juror in a capital case.
Further inquiry was made by the judge in certain instances
to determine whether the juror was free from bias, had
formed an opinion, and stood genuinely indifferent.   It is
settled that whether questions additional to those pre-

scribed should be asked is a matter for the trial judge to decide. *Commonwealth* v. *Cero,* 264 Mass. 264, 271. *Commonwealth* v. *Millen,* 289 Mass. 441, 475–476. *Commonwealth* v. *DiStasio,* 294 Mass. 273, 280–282. *Commonwealth* v. *Taylor,* 327 Mass. 641, 647.

There was no error in the denial of the defendant's request.

There was also no error in denying subsequent requests of the same import presented as each of the fourteen jurors who were subsequently empanelled was called.

The evidence was voluminous and in important particulars is summarized as follows. Other evidence is recited in connection with the discussion of assignments of error relating to its admissibility.

The defendant and Mildred H. Bonomi were married in 1941 when he was twenty and she sixteen years of age. In about two months they separated and were divorced in 1943. They remarried in 1947 and continued to live together until August, 1955. They dwelt with their two children, a daughter, Carol Ann, aged fourteen, and a son, Domenick, Junior, aged eighteen months, in a house which the defendant built, at 321 Gannett Road in that part of Scituate called North Scituate. The house was of one story with bedrooms, a living room, a kitchen, and at the left end as viewed from the street a room with an outside front door which the defendant used as an office. He conducted a construction business through a corporation, Scituate Construction Company, Inc., of which, except for two qualifying shares held by his wife and her brother George E. Haley, he held all of the stock. Mrs. Bonomi was the clerk. In May and June of 1955 there were frequent quarrels between the defendant and his wife, in one or more of which he struck her. On August 31 mutual ill will had reached a point that there were pending a libel for divorce brought by the husband and a petition for separate support instituted by the wife. At that time the defendant was living in a room at Scituate Harbor by reason of a temporary order of the Probate Court in the separate support pro-

ceeding, issued on August 22, that he obtain a "separate place of abode" and pay $100 a week for the support of his wife and children. He was allowed to continue the use of his office at 321 Gannett Road, but the door between it and the adjoining kitchen was kept locked on both the office and the kitchen sides. About a week before Wednesday, August 31, the defendant told Carol Ann that he was going to give her tickets to the Music Circus, an entertainment which was running in Cohasset. On Tuesday, the thirtieth, learning that his daughter's cousin, Mary Beth Haley, a girl of ten years, was at the house on a visit, he invited her to accompany Carol Ann and said that he would call for the two girls at 1 or 1:30 P.M. On Wednesday morning, the day they were to go, he told them to be ready at 12:30. The girls and Mrs. Bonomi lunched about noon, the latter having orange juice, bread and butter, bacon and eggs, and cake. The defendant, dressed in khaki shirt and pants, arrived at the house between that hour and 12:30 driving a black panel truck which he customarily drove and which had the name of his corporation painted on the sides. He said to hurry up as they were to stop on the way at the Lad and Lassie Shop in North Scituate where Carol Ann previously had selected a jacket. They stopped at the shop and the defendant seemed to be and said that he was in a hurry. He drove to Cohasset at a speed of forty-five to fifty miles per hour and left the girls in the business section of the town at about 12:50 according to the recollection of Carol Ann. The entertainment, which was to take place within walking distance, was not to start until 2:30. Carol Ann called her mother on the telephone, as soon as her father left, from a nearby drugstore and talked with her. Between 12:45 and 1 P.M. women who were driving in an automobile by the Bonomi house heard a woman scream, and saw a woman with red hair on the ground with her feet on a concrete stoop by the office door and a man in khaki clothes hitting her and trying to stuff a cloth or "something" in her mouth. A dark colored panel truck was on the grass in front of the house. At

approximately 1:05 the defendant's panel truck was observed backed up to the office door and at about 1:15 the defendant was seen driving the truck away from the vicinity of his house by way of Hollett Street in the general direction of Scituate Harbor at an estimated speed of forty to fifty miles an hour. There was no evidence that thereafter the defendant was seen by anyone until he appeared in North Scituate at two o'clock or a few minutes after, waved to a police officer and stopped to buy gasoline at Zucker's filling station.

On that same day two employees of the defendant, Gardner and Rodrigues, were burning brush on a side street off Woodland Drive, a private way in North Hanover, which had been constructed by the defendant in 1954. Between 11 and 11:30 in the morning the defendant came to them on foot and said that he was "stuck off Route 3," a thoroughfare which passes the end of Woodland Drive. They found his truck against a tree in a nearby rough wooded section at the end of Henry's Lane five hundred feet from the highway. The truck of the defendant having been pushed back, he drove away in it. He returned in the afternoon at about 2:30 to where they were working. He tore up some papers and threw the pieces out of the window of the truck. He tossed a cement block out of the back of the truck and some building paper with rope wrapped in it, which paper and rope he threw on the fire. He then wiped off the floor of the truck with a cloth and cleaned out the pit where the spare tire goes in. He drove off and shortly came back and told the men to go look for cedar posts.

On the next day the men found in the remains of the fire the iron portion of a rake or hoe with the wood handle "all burnt," which was used in the defendant's business for tamping dynamite holes when blasting, and was customarily kept in the panel truck. It was not there when they left on the previous afternoon to look for cedar posts. They collected the pieces of paper which the defendant had torn and put them in a can. When pieced together they proved

to be the license to operate a motor vehicle of Mrs. Bonomi, dated August 5, 1955, and the registration certificate dated January 1, 1955, of her Ford coupe.

At about 3:30 on that Wednesday afternoon the defendant purchased a truck load of gravel for $5 from one Smith who was working as a shovel operator for William Mason at Petrell's gravel pit on Main Street, Hanover. As instructed by the defendant, the driver of the truck, Warren Prince, followed the defendant to Woodland Drive, and dumped the load at a place pointed out by the defendant who told him to back up and "stay in the truck and dump the body up." The gravel was deposited at the side of the road where water ran under the road through a culvert, hereinafter referred to as culvert number 2. The defendant arrived back at the circus at 4:40 and while waiting for the children to come out talked with two Cohasset police officers, Conte and O'Neil. When Carol Ann came out she noticed that, instead of the khaki shirt which he had worn in the morning, he had on a clean blue shirt and that his shoes were polished. When the defendant and the children reached home they found there George E. Haley, Mrs. Bonomi's brother, who asked, "Do you know where Millie is?" The defendant said "I don't know," and "Has my compressor come in yet?" Mrs. Bonomi was reported to the police as missing and thereafter was never seen alive. All of her clothes except a blue blouse and Bermuda shorts were found in the house. The defendant spent the evening of his wife's disappearance and each evening, except one, thereafter until he was arrested in the company of one Elizabeth or Betsy Rice who had been, on an occasion of which there was testimony, the subject of controversy with his wife.

On Monday, September 5, a human foot was observed by Lieutenant Peloquin, a police officer, protruding from the water at the culvert on Woodland Drive where Prince had dumped the gravel. On removing the gravel the body of Mrs. Bonomi was uncovered, without shoes and dressed in a blue blouse and Bermuda shorts. It lay under the gravel and the water which at that spot flowed under the road

through a thirty inch culvert. The head was toward the road, and held down several feet below the surface of the water by a cement block to which it was tied. A piece of rope and a blouse or scarf were tied around her neck. The skull and an elbow bone were fractured, the nose was broken, and there were multiple wounds on the head inflicted by a blunt instrument. Death was caused by these wounds and by strangulation by ligature. She had died between one half hour and three hours after eating and from ten minutes to an hour after the blows were inflicted.

The following assignments of error are stated according to their substance with parenthetic reference to the exceptions on which they are based. The repetition or duplication of many exceptions is due to the saving of substantially the same exceptions both before the judge in conference and later before the jury.

Assignments 17–19 (exceptions 23, 24, and one unnumbered) relate to the direct examination of Carol Ann Bonomi by the district attorney. She was asked how her father appeared when he left her and whether she noticed "any difference in . . . [his appearance] so far as happiness or nervousness or anything else between the time when he left" her at one o'clock and the time he picked her up at five o'clock; — anything different about him concerning his appearance, nervousness, being in a hurry or any such thing. The questions were competent to elicit evidence tending to show a condition of mind significant of an ulterior purpose in taking the children away from the house. A condition of nervousness or happiness is a fact not readily to be described and may be testified to as an observable condition, partaking of the nature of description rather than inference or conclusion. *Commonwealth* v. *Borasky,* 214 Mass. 313, 319. It is a compound of fact and opinion. *Commonwealth* v. *Sturtivant,* 117 Mass. 122, 133–137. See *Commonwealth* v. *Piper,* 120 Mass. 185; *Commonwealth* v. *Trefethen,* 157 Mass. 180; *Commonwealth* v. *Gangi,* 243 Mass. 341, 345; *Hall* v. *Shain,* 291 Mass. 506. There was no error. *Commonwealth* v. *Williams,* 171 Mass. 461.

Assignment 20 (exception 25). The same witness was asked, "What did he say about . . . you or us going to Cohasset" and replied, "He changed his mind so quick." A motion to strike out the answer as not responsive was denied. It might well have been allowed but no harm to the defendant resulted as the answer added nothing to other facts which were in evidence. The fact itself was competent and material. See *Berlandi* v. *Commonwealth,* 314 Mass. 424, 452; *Commonwealth* v. *McGarty,* 323 Mass. 435, 439–440; *Commonwealth* v. *Taylor,* 327 Mass. 641, 649.

Assignments 21 and 22 (exceptions 26, 27, and 28). The same witness testified that when her father brought her home, her uncle was there and when asked what he said answered, "He said, 'Do you know where Millie is?'" and when asked what her father said answered, "He said, 'I don't know.'" There was no error. It was a conversation in which the defendant participated and concerned his knowledge as to the absence of his wife.

Assignments 23 and 24 are waived.

Assignments 25, 26, and 27 (exceptions 34, 35, and 36) relate to the refusal to strike out the testimony respectively of Eleanor Spang, Kathryn Spang, and Anna E. Spang who had testified to what they had seen about one o'clock in front of the defendant's home when passing in an automobile. The speed of the automobile and their alleged lack of opportunity to observe which were the grounds of the exceptions were matters going to the weight of their evidence but not to its competency. *Smith* v. *Neibauer Bus Co.* 328 Mass. 624, 626.

Assignment 28 (exception 33). There was no error in admitting a question to Josephine Beatty, the proprietor of the Lad and Lassie Shop, as to how the defendant appeared at the time he stopped there. She answered, "[H]e was extremely nervous and in a hurry." The fact that she had not known the defendant before went to the weight rather than the competency of her testimony. It was admissible for the reasons stated in reference to assignments 17–19.

Assignment 29 (exception 35) relates to the admission of

the testimony of Alvin W. Gardner, an employee of the defendant, that he took the iron head of a tamping stick out of the fire on Thursday, the day after he saw the defendant throw certain articles into the fire. There was no error. As already stated, Gardner had been burning brush with Rodrigues on Wednesday and it was inferable that the piece of iron, which was like that used by the defendant in his business, had been thrown there by him at some time in the previous afternoon. See *Commonwealth* v. *Simpson,* 300 Mass. 45, 56–57; *Commonwealth* v. *Teregno,* 234 Mass. 56, 58; *Commonwealth* v. *Wallace,* 326 Mass. 393, 395–396.

It was competent to show the disposal by the defendant of an instrument capable of being used in the commission of the crime, without direct proof that the particular instrument was in fact the one used. *Commonwealth* v. *O'Toole,* 326 Mass. 35, 39. *Commonwealth* v. *Teregno,* 234 Mass. 56, 59. *Commonwealth* v. *Dawn,* 302 Mass. 255, 259. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 470, and cases cited. *Commonwealth* v. *Cataldo,* 326 Mass. 373.

Assignment 30 (exception 36). The piece of iron itself was admissible as an exhibit.

Assignment 31 (exception 37). The can in which the men put the pieces of paper which the defendant had thrown on the ground was admissible as the container in which the paper was collected and given to a police officer for examination. *Commonwealth* v. *Noxon,* 319 Mass. 495, 539–540.

Assignments 32 and 33 (exceptions 38 and 39) relate to an inquiry by the district attorney to the State chemist, Dr. McBay, whether, referring to the piece of iron, fire would obliterate possible sign or extinguish trace of blood. It was the theory of the Commonwealth that the piece of iron could have been used to inflict the wounds on the head of the deceased and it was permissible to offer evidence tending to account for the absence of blood upon it. *Commonwealth* v. *Polian,* 288 Mass. 494, 501.

Assignments 34 and 35 (exceptions 42 and 43). Lloyd Smith, from whom there was evidence that the defendant purchased a load of gravel, was rightly allowed to testify

that the defendant had never purchased a "single" load before. The evidence was material as showing that the purchase in question was unusual and inferentially was for a purpose other than one incident to the defendant's business. *Commonwealth* v. *Wallace*, 326 Mass. 393, 395.

Assignment 36 (exception 44). A picture of the dump truck which had been driven by Prince was properly admitted to show how its hoist operated although it did not appear that the position of the hoist as shown in the picture was the same as when used to dump the gravel in question.

Assignment 37 is waived.

Assignment 38 (exception 46). A question to William Mason, whether during the year previous to August 31 he had sold a load of gravel to the defendant, was admissible for the reasons stated with respect to assignments 34 and 35.

Assignments 39–42 (exceptions 47–54) relate to the admissions of conversations between the defendant and police officers Conte and O'Neil outside the Music Circus in Cohasset about 4:40 P.M. on August 31 and the later refusal to strike out the conversation with O'Neil. The defendant told them that he was having trouble with his wife; that he was divorced once; that he was going to be divorced again; that he had a room at Scituate Harbor and was paying $100 a week to his wife; and that she was a good mother and had the meals and everything ready, but she was always nagging him. The objection of the defendant is that these talks were incompetent because irrelevant, were not in the nature of admissions, and did not constitute consciousness of guilt. The fact of the talks and the content thereof were material. It appeared that the circus did not end until 5 P.M. and it was inferable that the defendant attempted to impress the two police officers, whom he barely knew, of the time he was in Cohasset. His talk about his wife indicated that for some reason she was on his mind. There was no error.

Assignment 43 (exceptions 55–57) relates to the testimony of George E. Haley in reference to the talk which was the subject of assignment 21. No error appears.

Assignments 44 and 45 are waived.

Assignments 46–48 (exceptions 63, 65, 67, and 68). These assignments relate to the testimony of the same witness that on August 17 about 8:45 P.M. he saw the defendant with Betsy Rice in an automobile parked at Scituate Harbor; that he called Mrs. Bonomi, who came down and went toward the automobile; that he heard the defendant say something; that he went over and found his sister emotionally upset; that he took her to a doctor and that the next day he saw "marks on both arms and the front bone of both legs were getting dark."

The evidence was admissible as descriptive of an incident which caused trouble between husband and wife. The occurrence led to a complaint of assault and battery made by Mrs. Bonomi against the defendant shortly thereafter in the District Court.

Assignment 49 (exception unnumbered). There was no error in admitting a certified copy of the complaint as an exhibit. Its evidential use was restricted to proof of the fact that Mrs. Bonomi had made the complaint.

Assignments 50–55, 63, 64, 66–69, 76–78, and 80 (exceptions 70–80, 91–93, 95–99, 108–110, and 112). These assignments relate to incidents connected with the use of an answer recorder, a telephonic device, which had been installed in the defendant's office a few days before August 31. Its purpose was to record incoming telephone calls received in his absence, as after his separation from his wife there was no one to answer such calls. On Saturday, September 3, the defendant called his brother-in-law Haley and several friends of his wife into his office and asked them to listen to a recorded call of the previous day. Each listened in turn and heard a voice say "Hello, darling." Each listener testified that it was not Mrs. Bonomi's voice, but the defendant insisted that it was. He said to Haley, "God damn it, if that is not my wife's voice, it is that one's in there" (meaning Elizabeth Haley, his sister-in-law, who was in the kitchen). When one Rita Tower said that she did not think that it sounded like Millie's voice "at all" he pounded on

his fists, stamped the floor and said, "It is her — it is her." There was no error in permitting the different witnesses to testify to these incidents. It could be found that he knew the voice was not that of his wife and attempted to create a false impression that she was still alive. See *Commonwealth* v. *Shea*, 323 Mass. 406, 414, and cases cited. The recorder and its accompanying ear phones were properly admitted as exhibits. Counsel for the defendant conceded that the recording device was mechanically accurate. *Commonwealth* v. *Wakelin*, 230 Mass. 567, 574, 575.

Assignment 56 (exceptions 81 and 82). Elizabeth Haley, who was one of the listeners to the answer recorder on Saturday, testified that later in the afternoon she was in the kitchen and heard the defendant say on the telephone "that he didn't know where his wife was . . . and that he should not be seen too much in public, not for a while anyway," and that he ended by saying, "So long, honeybunch, I will pick you up about 5:30 or quarter of six." It could be inferred from other testimony that he was talking to Betsy Rice and his words were properly admitted as material to show both his attitude toward his wife and his relation to the other woman.

Assignments 57 and 58 (exceptions 83 and 84). Irwin M. Golden, who had been attorney for Mrs. Bonomi, was properly allowed to testify that there were pending in the Probate Court a libel for divorce brought in the summer by the defendant and a petition for separate support brought later by Mrs. Bonomi, and that a hearing had been held on the petition before the judge of probate on August 22.

Assignment 59 (exception 85). A copy of the temporary order issued on that day with the officer's return of service on the defendant on August 29 was also rightly admitted as an exhibit.

Assignments 60 and 61 (exceptions 86–88). There was no error in permitting the attorney to testify that the judge announced the order orally in the defendant's presence and that in reference to the weekly payment of $100 he heard the defendant say, "I'll never pay that." The

evidence was material as bearing on hostility of the defendant toward his wife.

Assignment 62 (exceptions 89 and 90). As material to the defendant's feeling regarding his wife and his reaction to her disappearance, Kenneth Hurwitch, an attorney, appointed guardian ad litem of the Bonomi children, was properly allowed to testify that on September 3 the defendant approached him and said that he was "sure his wife had gone mental . . . [and] that anybody who tried to tangle with her would find a tiger on their hands." He asked, "Now that she isn't around, who can enforce that order?"

Assignment 65 (exception 94). There was no error in admitting a telephone conversation of the defendant with Rita Tower on Thursday in which she suggested the possibility of suicide and he said, "She is too yellow to commit suicide."

Assignment 70 (exception 100). There was no error in admitting a record of the telephone company, offered through the district manager, which was kept in the usual course of business and which showed a completed telephone call from DeLory's drug store in Cohasset to the number listed in the name of Mildred Bonomi at 12:30 P.M. on August 31. It was inferable from the source and destination of the call that it was the one to which Carol Ann had testified and if so found was evidence of the time that she was left by her father in Cohasset. See *Commonwealth* v. *Chance*, 174 Mass. 245, 249.

Assignments 71–73 (exceptions 101–104). As bearing on the hostility of the defendant toward his wife one Nellie Park, a neighbor, who was called by Mrs. Bonomi to the Bonomi home on June 5, was allowed to testify that she saw the dresser drawers were open and the defendant was throwing clothes around and that she heard him call his wife "a dirty son of a bitch." The testimony plainly was competent. See *Commonwealth* v. *Abbott*, 130 Mass. 472, 474; *Commonwealth* v. *Umilian*, 177 Mass. 582; *Commonwealth* v. *Howard*, 205 Mass. 128, 148–149; *Commonwealth* v. *Bartolini*, 299 Mass. 503, 510–511.

Assignments 74 and 75 (exceptions 106 and 107). The testimony of Walter Driscoll, a police officer, was also admissible. Later on the same day he saw that a chair had been overturned in one of the bedrooms and heard the defendant say that if his wife did not produce a certain bank book by nine o'clock "he'd break every bone in her body."

Assignment 79 (exception 111). Evidence relating to the defendant being in touch with the telephone company's employee who brought the answer recorder to court does not appear to have been material, but was not harmful. *Commonwealth* v. *Bartolini*, 299 Mass. 503, 511, and cases cited.

Assignment 81 (exception 119). A photograph of the piece of tamping iron which had been admitted as an exhibit, as it lay in the place where it was found, was admissible as an aid to the jury in determining whether it had been thrown in the fire by the defendant. *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 471.

Assignment 82 (exception 120). Also admissible was a photograph of the defendant dressed in khaki shirt and pants as helpful to the jury in considering the testimony of one or more of the women who, while passing by in an automobile, had seen a man so dressed in front of the Bonomi home.

Assignments 83–91, and 111–113 (exceptions 121–134, and 165–168) relate to statements made by the defendant when interrogated as to his wife's disappearance and his activities on August 31 by Chief Kane of the Scituate police on Thursday, September 1, and by Lieutenant Peloquin of the State police in the presence of Chief Kane on Friday, September 2. He described his wife as a woman weighing one hundred thirty pounds and having red hair. He said to Chief Kane that he took the girls to the circus about 12:30 P.M.; that he stopped with them at the Lad and Lassie Shop and left them in Cohasset at about 12:50. On returning he passed his house and went in the direction of Scituate Harbor to Hillside Road where he was figuring a job for one Eliza Berg. He stayed there about twenty

minutes and then went to Mitchell's gravel pit in Norwell. He arrived back home about two o'clock and there saw his wife who gave him the baby to take for the afternoon. He then went to where his men were burning brush and left for Cohasset at 3:30. He spoke of persons who had seen him during the afternoon drive. He said that he arrived at the Music Circus about 4:30 and talked with the Cohasset police officers. After leaving the children at home he went to his room and later kept an appointment with Betsy Rice to go to supper. His statement to Lieutenant Peloquin was similar to that made the previous day to Chief Kane except that to the lieutenant he said that he thought he left the girls around 12:45 P.M. and that he stayed at the Berg premises about half an hour.

It is contended by the defendant that these statements were inadmissible on the grounds, first, that the district attorney asked only for the substance of the conversations and, second, that the statements were not in the nature of admissions, were not equivocal, and did not constitute consciousness of guilt. It is plain that the form of the questions was unobjectionable. *Kittredge* v. *Russell,* 114 Mass. 67, 68. *Hayes* v. *Pitts-Kimball Co.* 183 Mass. 262, 263–264. Wigmore on Evidence (3d ed.) § 2097. A witness rarely can recite an oral conversation verbatim. All that in reason he can be asked to do is to give the substance of the talks. *Ives* v. *Hamlin,* 5 Cush. 534, on which the defendant relies, is not an authority to the contrary. In that case a deposition was rejected because it appeared that the deponent was stating what he "understood and supposed" was the effect of a certain agreement and not what he understood the agreement to be from the language and conversation which he heard. The statements to Chief Kane and Lieutenant Peloquin were admissible as admissions. An admission in a criminal case is a statement by the accused, direct or implied, of facts pertinent to the issue, which although insufficient in itself to warrant a conviction tends in connection with proof of other facts to establish his guilt. *Commonwealth* v. *Haywood,* 247 Mass.

16, 18, and cases cited. *Commonwealth* v. *Merrick*, 255 Mass. 510, 512. *Commonwealth* v. *Gleason*, 262 Mass. 185, 190. The activities of the defendant on the day the murder was alleged to have been committed were material to the issue of his guilt. If, in describing them, it were found that he made wilfully false statements in material particulars to the investigating authorities, consciousness of guilt could be inferred. *Commonwealth* v. *Abbott*, 130 Mass. 472, 473–474. *Commonwealth* v. *Spezzaro*, 250 Mass. 454, 457. *Commonwealth* v. *Sokorelis*, 254 Mass. 454, 457. *Commonwealth* v. *Alba*, 271 Mass. 333, 338. There was no request to strike out any particular question or answer. Incidental denials of certain facts by the defendant did not make the conversations as a whole inadmissible. *Commonwealth* v. *Robinson*, 165 Mass. 426, 428–429. *Commonwealth* v. *Grieco*, 323 Mass. 639, 641. See *Commonwealth* v. *Feci*, 235 Mass. 562, 567.

Specific exception was taken to a question to Chief Kane, "Did the defendant say anything in his account . . . about having purchased any gravel at the Petrell pit?" The question was proper in form to elicit a negative response. An admission may be implied from conduct as well as from words. *Commonwealth* v. *Devaney*, 182 Mass. 33, 36. *Commonwealth* v. *Merrick*, 255 Mass. 510, 512. The omission to tell of the gravel incident could be found to be the conscious concealment of a fact which might lead to the discovery of his wife's body.

Specific exceptions were also taken to the admission of a diary of the defendant, shown by him to Lieutenant Peloquin, which contained entries purporting to state the defendant's activities beginning at 11:45 A.M. on August 31. The entries were made after his attorney on September 1 had advised him to keep a record of his activities. The diary was plainly admissible. See *Commonwealth* v. *Noxon*, 319 Mass. 495, 513–515, 533; *Commonwealth* v. *Teregno*, 234 Mass. 56, 59.

Assignment 92 is waived.

Assignments 93 and 94 (exceptions 136 and 137). Chief

Kane was properly allowed to testify that it took him sixteen minutes to drive to Woodland Drive from Zucker's filling station and seventeen minutes to drive there from the Bonomi home by way of Hollett Street when travelling at a rate of thirty-five to forty miles per hour. It appeared in the evidence that the distance was between ten and eleven miles, and the element of time was material. *Commonwealth* v. *Costley*, 118 Mass. 1. The defendant himself testified that he drove from his house to the place where the brush was burned in about twenty minutes.

Assignment 95 (exceptions 138 and 139). There was no error in allowing Sieminski, the operator of Zucker's filling station at North Scituate, where the defendant made out and signed a charge slip for gasoline at about two o'clock, to testify as to the defendant's usual custom when making purchases. It could be found that in varying from that custom by making out the slip himself he intended to impress the operator of his presence there at a specific time.

Assignments 96 and 110 (exceptions 141, 142, and 164). There was evidence that Emily Hart, who lived next door to the Bonomi house, was sitting at a window facing the Bonomis' front yard from about 1:45 P.M. until 2:45 P.M. on August 31. She was properly allowed to testify that she did not see the defendant drive in during that time and particularly around 2 P.M. at which time he had told Chief Kane and Lieutenant Peloquin that his wife had given him the baby. The form of the district attorney's question to her was unobjectionable. A photograph, exhibit 52, of the Bonomi front yard taken from the window where Mrs. Hart said she was sitting was admissible and there was no error in refusing to strike it out. The jury had taken a view of the premises and could determine whether the picture accurately portrayed what portion of the yard was within her range of vision.

Assignments 97–100 (exceptions 141–144, as numbered in the record) concern the testimony of Betsy Rice on direct examination by the district attorney. A question as to when the defendant formed a new corporation was not

incompetent as hearsay. It related to the time when his wife was superseded as clerk of the former corporation and presumably was a matter of which, as the defendant's bookkeeper, she had knowledge. The witness testified that she made a telephone call to the defendant's office on Friday. A question "What message did you leave?" was competent in view of the message of "Hello, darling," presumably recorded on that day. Her answer "That I had been home all evening" was material as bearing upon her relations with the defendant and tended to support an inference that it was she to whom the telephone call by the defendant which his sister-in-law overheard on Saturday was made. She was properly allowed to testify that on Sunday, September 4, the defendant said to her he "wished that somebody had saw his wife after 2 o'clock so that it wouldn't look as though he had anything to do with it." He also said, "If I ever did anything like that I'd bury the body some place where nobody would ever find it," adding, in response to a question "where that was," "In a cemetery." That he had such a method of disposal in mind could, with other facts, be found to be evidence of a guilty conscience. *Commonwealth* v. *Polian*, 288 Mass. 494, 501.

Assignments 101 and 102 are waived.

Assignments 103 and 109 (exception 149 and one unnumbered). Dr. Katsas, who performed the autopsy, testified that from an examination of the decomposed contents of the stomach and intestines it was his opinion that the woman had died between one half hour and four hours after eating and that he found in the stomach particles of food consistent with muscle. The district attorney properly was allowed to ask him, "That is, your conclusion is that at some time before death, this person had consumed meat?" The witness answered that the finding is consistent that the person had meat. Objection was made to a hypothetical question as to how long after eating death could have occurred because the question omitted to mention cake, which the deceased was said to have eaten, and did not contain an assumption as to the condition of the food in

the stomach. There was no error. The witness had fully
testified as to what he had found and stated that the presence
of cake would not change his opinion as to the relative time
of death.

Assignments 104–108 (exceptions 155–161). Objection
was made to the admission of statements made by the de-
fendant to Lieutenant Harnois of the State police at the
Norwell police barracks on September 6 on the same grounds
that objection was made to the defendant's statements to
Chief Kane and Lieutenant Peloquin. There was no error.
Asked by the police officer whether the spot where his wife's
body had been found was where he had dumped the load
of gravel, he answered, "Yes." He said that several months
before he had been told by the town authorities to straighten
out the road; that his only explanation of the murder was
it was one of her former boy friends; that she had returned
to her former trade, that of a "whore"; that he did not
know the names of her former boy friends; and that the last
time the spare tire had been out of the truck was two weeks
before when he had it repaired. Asked why he tore up the
papers he said, "those were old papers." He also said that
he had replaced his wife who had been clerk of the Scituate
Construction Company, Inc., with Betsy Rice. It is plain
that these statements were in the nature of admissions and
were material to the issue of his guilt. An attempt to place
responsibility on another may with proof of other facts be
evidence of a guilty mind. *Commonwealth* v. *Gettigan,*
252 Mass. 450, 463.

Assignments 114–119, 121, 123–125, and 127 (exceptions
169–174, 177, 179, 181, 182, and 184–187) relate to state-
ments which the defendant made in the Brockton court
house in the early morning of September 6 in response to
questions by lieutenants Peloquin and Simmons of the
State police, chief of police Pelletier of Cohasset, and State
trooper Pastuch after the body of Mrs. Bonomi had been
discovered. The police brought the defendant to the court
house, although it does not appear that he was then under
arrest. Lieutenant Peloquin asked him if he paid $5 to

Mason's shovel operator for some gravel on August 31. He said, "No, that was on Thursday." Warren Prince was brought in and "the defendant stood upright, got out of his chair and stood right up, stiff, and appeared excited." Prince stated the facts as to the dumping of the gravel substantially as he later testified and the defendant said, "That is right." Miss Cassidy, the police stenographer, then read statements of Gardner and Rodrigues which had previously been taken by her as to the two visits made by the defendant to the place where they were burning brush and as to the acts of the defendant which they observed. These statements also were substantially the same as their subsequent testimony. Asked if the statements were true the defendant said, referring to one of these statements, "He said it was 2. It was about twenty past two . . . the pole [referring to the tamping pole] is home against the maple tree." On suggestion that it might be another pole, he said, "No. That rope was in my truck six or seven months. That cement block was in there almost six or seven months too. I am not in the cement business any more. That was when I was doing foundation work . . . ." Asked if he had torn up a license and a registration he said, "Yes, but it was an old one that had been in the truck." Admitting in response to a question that it was "funny" that he picked that spot to dump the gravel, he said that he "didn't know she was there." During the inquiry he said he "wasn't in that yard between 1 and 2 . . ., at 2 o'clock . . . [he] was there." He went from Scituate to the Hanover job in twenty minutes. Asked if "That was building paper on the floor of the truck," he answered, "Yellow." He said that he just scraped the cement off the bottom of the truck; that the rope which he burned was in pieces — probably fifteen or twenty feet; that he dumped the gravel because "Petrell, the owner of the project, had complained about erosion in the road there about five months ago and that he had just got around to it." As to burning the tamping stick he said, "Oh, that's nothing. I have another one of those at home." As to cleaning out the truck he said, "there were

just some old rags that he wanted to get rid of . . . [and] he was just getting rid of some old cement." The statements were admissible for reasons we have previously stated. No motion was made to strike out any particular question or answer. The description of the defendant's appearance and conduct when Prince was brought in was competent for reasons stated in discussing assignments 17–19.

Assignment 120 (exception 175). Objection was made to the admission of a certificate of the Cohasset weather bureau showing a rain fall of 0.24 inches between August 31 and September 3 on the ground that the place where the record was made was too remote from the culvert at North Hanover. The distance was from twelve to fourteen miles, and the record was admissible in the discretion of the judge.

Assignment 122 (exception 178) refers to a question to Lieutenant Simmons whether on the night of September 5 he stopped at the place where the gravel was dumped because of something Prince told him. If the jury drew the inference that something said by Prince furnished the witness information as to the gravel, that added nothing of evidential value to what he observed and did the defendant no harm. His testimony simply made his stop at that particular place seem more natural. *Commonwealth* v. *DiStasio*, 294 Mass. 273, 287. See *Commonwealth* v. *Piper*, 120 Mass. 185, 187.

Assignment 126 (exception 183). The cement block taken from the truck by the defendant was properly admitted as an exhibit. It appears to have been similar to a block which was found under the head of Mrs. Bonomi and could have been found to have been in the truck in preparation for its use in the disposal of the body. See *Commonwealth* v. *Robinson*, 146 Mass. 571, 578.

Assignment 128 (exceptions 190–193). At the Norwell police barracks on the late afternoon of September 6 the defendant told Chief Pelletier that he decided to buy the gravel fifteen minutes before he bought it and also told him

that he directed the driver not to get out of his cab. These statements plainly were admissible.

Assignments 129–131 (exceptions 194, 195, and one unnumbered). In the evening of August 31, when Sergeant Jones of the Scituate police talked with the defendant as to his wife being missing, the defendant gave him the name of some person in New Jersey but not the person's address. The sergeant pointed out to him tire marks appearing in the grass in front of his office, and the defendant said that he had backed his truck up at 11 A.M. to carry some office records into the office. This evidence was competent.

Assignment 132 is waived.

Assignments 133–150 (exceptions 199–203 and 205–218) relate to the admission of questions in cross-examination of the defendant and certain witnesses called in his behalf, and require no discussion. The rulings of the judge were discretionary and disclose no error. *Commonwealth* v. *Gettigan*, 252 Mass. 450, 463. *Commonwealth* v. *Corcoran*, 252 Mass. 465. *Commonwealth* v. *Barber*, 261 Mass. 281. *Commonwealth* v. *Knowlton*, 265 Mass. 382, 386.

Assignments 151–153 (exceptions 219–221) relate to the testimony of the witness Mason, recalled by the Commonwealth in rebuttal, that the gravel at culvert 3 was similar to that taken from a pit used in the construction of Woodland Drive and that the gravel at culvert 2 was similar to that being carted from Petrell's pit. The defendant had testified that he dumped the gravel at a culvert on Woodland Drive to which he referred as culvert number 3 and not at culvert number 2 where his wife's body was found, and had called as a witness an expert on geology who gave it as his opinion that the gravel at number 2 culvert did not come from Petrell's pit but that the gravel at number 3 culvert was consistent with having come from that pit. Mason was a man experienced in dealing with gravel and could be found qualified to give his opinion as to the appearance of the gravel. His testimony that gravel had previously been dumped at about the location of culvert 3 because of the breaking there of an axle on a dump truck was also properly

admitted as explanatory of a pile of gravel which appeared at that place.

Assignment 154 is waived.

Assignments 155 and 156 (exceptions 223 and 224) are to the denials of motions by the defendant at the conclusion of the evidence for directed verdicts of not guilty of murder in the first degree and murder in the second degree. There was evidence that Mrs. Bonomi was murdered and that the murder was committed at some time between 12:30 P.M. or thereabouts on August 31, when she was last seen by her daughter, and 3:45 P.M. on the same day when the gravel was deposited at the place where her body was later found. While the Commonwealth is not required to prove a motive for a murder, if there is evidence of motive, that evidence is, with proof of other facts, entitled to consideration. *Commonwealth* v. *Howard*, 205 Mass. 128, 148. *Commonwealth* v. *Feci*, 235 Mass. 562, 567. There was evidence of a feeling of hostility by the defendant toward his wife and of an attachment he had formed for another woman. Marital troubles as disclosed by the evidence were of such a nature that they could be found likely to produce an easily provoked and violent state of mind on his part. *Commonwealth* v. *Russ*, 232 Mass. 58, 68. It could be found that on August 31 he arranged to have his wife alone in the house; that he was the person who was seen striking a woman, who in fact was his wife, in front of his office at about one o'clock on that day; that he inflicted injuries that caused her death; that he carried her in a dead or dying condition in his truck from his house to the place on Woodland Drive where her body was found; that he there concealed the body under a load of gravel; and that later he attempted to conceal his guilt by burning articles used by him in committing the crime. Statements and acts of the defendant denoting consciousness of guilt which appear in the evidence need not be repeated.

Proof of the crucial facts depended on the inferences which could reasonably be drawn from the circumstances. "When a material fact is not proved by direct testimony,

but is left to be inferred from the facts directly sworn to, the inference need not be a necessary one. There is a case for the jury, unless the inference either is forbidden by some special rule of law, or is declared unwarranted because too remote, according to the ordinary course of events. If there is a case for the jury, they are at liberty to use their general knowledge in determining what inferences are established beyond a reasonable doubt; and the facts inferred by them are as properly proved as if directly testified to." *Commonwealth* v. *Doherty,* 137 Mass. 245, 247. *Commonwealth* v. *Asherowski,* 196 Mass. 342, 347. *Commonwealth* v. *Merrick,* 255 Mass. 510, 514. *Commonwealth* v. *Alba,* 271 Mass. 333, 337. The case in many of its aspects is similar to *Commonwealth* v. *Costley,* 118 Mass. 1, and *Commonwealth* v. *Howard,* 205 Mass. 128, 148. See also *Commonwealth* v. *Webster,* 5 Cush. 295; *Commonwealth* v. *Williams,* 171 Mass. 461; *Commonwealth* v. *Umilian,* 177 Mass. 582; *Commonwealth* v. *Best,* 180 Mass. 492; *Commonwealth* v. *Tucker,* 189 Mass. 457; *Commonwealth* v. *Richmond,* 207 Mass. 240; *Commonwealth* v. *Russ,* 232 Mass. 58. The judge could not rightly have ruled that the evidence did not warrant a verdict of murder in the second or the first degree. The injuries inflicted on the deceased showed a conscious and fixed purpose to kill continuing for a length of time and warranted a finding of murder with deliberately premeditated malice aforethought. *Commonwealth* v. *Bartolini,* 299 Mass. 503, 515–516. *Commonwealth* v. *Brooks,* 308 Mass. 367, 369. These injuries also warranted a finding that the murder was committed with extreme atrocity and cruelty. *Commonwealth* v. *Desmarteau,* 16 Gray, 1, 10. *Commonwealth* v. *Feci,* 235 Mass. 562, 571. *Commonwealth* v. *Devereaux,* 256 Mass. 387, 394. *Commonwealth* v. *Knowlton,* 265 Mass. 382, 389. *Commonwealth* v. *Osman,* 284 Mass. 421, 425–426. *Commonwealth* v. *Vaughn,* 329 Mass. 333, 337.

Assignments 157 and 158 are waived.

Assignment 159 (exception 226) is based on a general exception to the charge so far as it related to murder committed with extreme atrocity and cruelty. An examination

of this portion of the charge discloses that it was both adequate and accurate. There was no error.

The defendant filed in this court a motion, supported by affidavits, for a new trial because of newly discovered evidence. G. L. (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341. The affiants state that about 3 A.M. on September 5 they heard a truck moving on Woodland Drive and a sound as if gravel or some other substance was being dumped in the vicinity of where Mrs. Bonomi's body was found. In view of the other evidence in the case regarding the dumping of the gravel at culvert 2, we think this evidence is not of a character to have had any substantial influence of the finding of a jury. The motion is denied.

We have carefully considered all of the evidence and the weight that properly may be given it, *Commonwealth* v. *Gricus*, 317 Mass. 403, 407, and are satisfied that justice does not require a new trial.

*Judgment affirmed.*